**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert MANNING, Defendant–Appellant.**

**No. 94–50117.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 1995.

Decided June 9, 1995.

---

Raymond J. Takiff, Boca Raton, FL, for defendant-appellant.

Dean G. Dunlavey, and Patricia A. Donahue, Asst. U.S. Attys., Los Angeles, CA, for plaintiff-appellee.

Before: WALLACE, Chief Judge, HUG, and HAWKINS, Circuit Judges.

WALLACE, Chief Judge:

Manning appeals from his conviction following a jury trial and life sentence for murder by mail bomb, in violation of 18 U.S.C. §§ 1716(a) and 2. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm the conviction and life sentence, but remand for the court to correct Manning's parole eligibility.

## I

On July 14, 1980, a cardboard box was mailed to the office of Ms. Brenda Crouthamel, now Mrs. Brenda Adams (Adams), at Prowest Computer Corporation. The box contained a packing slip with a letter dated July 11, 1980. The letter began "Dear Friend" and advised the reader that the box contained a "new invention" that would "open a new age in computer sales and advertising." The letter went on to say that the device in the box had a "prerecorded tape" that would describe the invention's "many functions" and that the reader should just "plug it in" to hear the tape.

The package was delivered on July 17, but Adams did not plug in the device, as she was on her way out of the office to look for a new car. Unfortunately, Adams's secretary, Patricia Wilkerson, opened the package, and upon reading the letter plugged the device into an outlet. The device exploded into hundreds of pieces of shrapnel, killing Wilkerson instantly. The office was destroyed, but the cardboard box and letter survived, having been placed behind an office desk that shielded them from the blast.

The box and letter were analyzed, and latent prints were discovered. A print on the box was mistakenly characterized as a partial palmprint, but was later discovered to be a fingerprint. Fingerprints were also discovered on the letter. The print on the box matched that of Manning, while the prints on the letter matched those of Manning's wife. Manning was already a suspect, because investigators believed that William Ross arranged for the killing of Adams over a business deal gone sour and that Ross had contacted Manning to carry out the killing. Telephone records linked Ross to Manning, and the markings on the cardboard box allowed investigators to trace the box to a wholesaler, and in turn to a company that had purchased the boxes. Manning had worked briefly at that company, and the packing slip found with the box was the same type used by the company that had purchased the boxes.

In July 1988, Manning and his wife were indicted on a one-count mail bomb charge, in violation of 18 U.S.C. §§ 1716(a) and 2. Manning's wife was then living in the United States. She subsequently left the United States, following a mistrial, and joined her husband in the West Bank of Israel. They were both arrested in March 1991. In July 1993, Manning was finally extradited to the United States to stand trial. Manning was arraigned on a superseding indictment on August 26, 1993, and on October 14, 1993, he was convicted. On February 7, 1994, he was sentenced by the district court to life imprisonment. He was not to become eligible for parole for 30 years.

## II

Manning's first argument is that the seven year pre-indictment delay and 30 month post-indictment delay requires that the charges against him be dismissed. We review for abuse of discretion the denial of a motion to dismiss for impermissible pre-indictment delay. *United States v. Butz*, 982 F.2d 1378, 1380 (9th Cir.) (*Butz*), cert. denied, —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993). Post-indictment Sixth Amendment speedy trial claims are reviewed de novo. *United States v. Sandoval*, 990 F.2d 481, 482 & n. 2 (9th Cir.) (*Sandoval*), cert. denied, —— U.S. ——, 114 S.Ct. 218, 126 L.Ed.2d 174 (1993).

**1194**

### A.

The pre-indictment delay in this case was caused by an error on the part of the investigators. Apparently, a print had been found on the bomb box, but it was thought that the print was a palmprint when, in actuality, it was a partial thumbprint. The discovery of the error led to a match between the print and Manning, albeit years after the bombing.

 Protection from improper pre-indictment delay is based upon the Due Process Clause. *United States v. Krasn,* 614 F.2d 1229, 1235 (9th Cir.1980). We consider in determining whether pre-indictment delay may bar prosecution (1) the actual prejudice to the defendant, (2) the length of the delay, and (3) the reason for the delay. *Id.*

 The most important element is whether the defendant has demonstrated that he has suffered actual, nonspeculative prejudice as a result of the delay. *Id.* In our analysis, "[w]e determine first whether a defendant suffers actual prejudice" and if so "we balance the length of the delay with the reasons for it" to determine if a due process violation occurred. *Butz,* 982 F.2d at 1380. Proof of prejudice must "be definite and not speculative. Courts apply the actual prejudice test stringently." *Id.* (citations omitted). The burden on Manning to prove actual prejudice is a heavy one. *United States v. Sherlock,* 962 F.2d 1349, 1354 (9th Cir.1989), *cert. denied,* —— U.S. ——, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). If Manning fails to demonstrate actual prejudice, our inquiry ends. *Butz,* 982 F.2d at 1380.

 Manning's assertion of prejudice is too speculative. Manning states that he lost access to his credit card records, which could have explained his location at the time of the killing. He also contends his memory was not as keen after the delay. He further argues that a potential "key witness" for his defense had died. This is not enough. Manning has not specifically stated what the credit card records would show, or made any showing regarding what the deceased witness would have said. Manning's argument embraces pure conjecture. Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual

prejudice. *See id.* Our inquiry is therefore at an end. The district court did not abuse its discretion by denying a dismissal on the basis of pre-indictment delay.

### B.

 We now turn to Manning's contention that the 30 month delay between his indictment and the government's formal request for his extradition from Israel violated his Sixth Amendment right to a speedy trial. Our analysis begins by determining whether the length of the delay between the indictment and the trial so exceeds the range of ordinary delay as to foreclose the conclusion that the case was prosecuted with customary promptness and to raise a presumption that the delay may have been prejudicial. *Doggett v. United States,* —— U.S. ——, —— ——, 112 S.Ct. 2686, 2690–91, 120 L.Ed.2d 520 (1992) (*Doggett*). Because the Sixth Amendment right to a speedy trial does not attach until the defendant has been arrested or indicted, *United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1981), the length of the pre-indictment delay in this case is irrelevant to the issue of whether Manning has been deprived of his Sixth Amendment right to a speedy trial. *See United States v. Koller,* 956 F.2d 1408, 1413 (7th Cir.1992). The only delay relevant to the question of whether Manning was deprived of his Sixth Amendment right to a speedy trial is the 30 month delay between Manning's indictment and the government's formal extradition request. For purposes of this analysis, we assume, without deciding, that 30 months is long enough to warrant inquiry into the delay.

 To determine whether post-indictment delay has violated a defendant's speedy trial rights under the Sixth Amendment, we usually consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Doggett,* —— U.S. at ——, 112 S.Ct. at 2690, *quoting Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Whether Manning "must show actual prejudice depends on whether it is he or the government who is responsible for the de-

lay." *United States v. Aguirre,* 994 F.2d 1454, 1456 (9th Cir.) *(Aguirre ), cert. denied,* —— U.S. ——, 114 S.Ct. 645, 126 L.Ed.2d 603 (1993).

■ Because the district court's finding that the government did not negligently cause the post-indictment delay was not clearly erroneous, Manning would be required to demonstrate actual prejudice to establish a violation of his Sixth Amendment right to a speedy trial. *Id.* We need not engage in this analysis, however, because Manning has waived his constitutional right to a speedy trial.

If the delay can be attributed to Manning himself, he will be deemed to have waived his speedy trial rights entirely. *Sandoval,* 990 F.2d at 483; *see also Aguirre,* 994 F.2d at 1457 n. 5 (distinguishing cases in which a defendant merely fails to assert his speedy trial rights from cases in which a defendant himself intentionally causes the delay). The district court expressly found that Manning knew of the indictment against him and that he "resisted all efforts to bring him to the United States." These determinations are sufficient to support the finding that Manning waived his speedy trial rights. *See Sandoval,* 990 F.2d at 483 (that defendant "purposely absented himself from the proceedings" is sufficient to establish waiver). Manning cannot avoid a speedy trial by forcing the government to run the gauntlet of obtaining formal extradition and then complain about the delay that he has caused by refusing to return voluntarily to the United States. Manning could have avoided any post-indictment delay by returning to the United States. His affirmative resistance of the government's efforts to secure his presence in the United States constitutes an intentional relinquishment of his right to a constitutional speedy trial, and he cannot now complain of the delay that he himself caused.

## III

■ Manning next asserts that even if the delay in bringing him to justice does not warrant reversal, the government failed to indict him within the applicable statute of limitations. The district court's conclusion

that a particular statute of limitations applies is reviewed de novo. *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 585 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994).

■ 18 U.S.C. § 3282 provides, with some exceptions not applicable here, that "no person shall be prosecuted, tried, or punished for any offense, *not capital,* unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." (Emphasis added.) Section 3281 defines a capital offense as "any offense punishable by death." Capital offenses have no statute of limitations period. *Id.*

Manning's crime under section 1716 was punishable by death at the time it was committed. However, in *United States v. Cheely,* 36 F.3d 1439 (9th Cir.1994) *(Cheely ),* we held that the provisions authorizing the death penalty for crimes committed in violation of 18 U.S.C. § 1716 are unconstitutional because those provisions "do not genuinely narrow the class of persons eligible for the death penalty." *Id.* at 1446 (internal quotation and citation omitted). Manning argues that because section 1716's death provisions are unconstitutional, the 5 year statute of limitations period applicable to noncapital offenses applies, and that the prosecution was therefore time-barred.

■ The government argues that Manning waived this claim because it was not raised in the district court. Because the statute of limitations is an affirmative defense that must be raised by Manning, failure to assert it at trial usually results in waiver of the defense. *See United States v. LeMaux,* 994 F.2d 684, 689–90 (9th Cir.1993). In this case, however, we conclude that Manning has not waived the defense because there was nothing to waive; section 1716 was not invalidated until after Manning's trial. Because it would have been futile for Manning to raise a statute of limitations defense at trial, we hold that he did not waive the defense. *See United States v. Gamble,* 943 F.2d 1030, 1031 (9th Cir.1991) (failure to object to magistrate's selection of the jury

did not bar claim, because at time of selection the objection would have been futile).

 The lack of waiver brings us to the merits of the statute of limitations issue. When a decision renders unconstitutional a penalty for an offense, it does "not necessarily have the effect of invalidating all statutes that were tied to the concept of a 'capital' case. If the statute's purpose derives from the nature of the offense with which the defendant is charged and not from the potential severity of the punishment, it remains in effect." *United States v. Kennedy,* 618 F.2d 557, 558 (9th Cir.1980) (*Kennedy* ), *citing United States v. Watson,* 496 F.2d 1125, 1128 (4th Cir.1973) (*Watson* ). After all, "[i]n a very literal sense, the offense defined [in section 1716] is still a 'capital crime;' the *statute* still authorizes the imposition of the death penalty and Congress has not repealed it." *Watson,* 496 F.2d at 1127 (emphasis added).

*Kennedy* concluded that because 18 U.S.C. § 3148 (allowing withholding of bail for capital offenses) was based on a defendant's "dangerousness," the statute's purpose was grounded on the underlying offense and not on a crime's potential penalty. *Kennedy,* 618 F.2d at 559. In *United States v. Dufur,* 648 F.2d 512 (9th Cir.1980), *cert. denied,* 450 U.S. 925, 101 S.Ct. 1378, 67 L.Ed.2d 355 (1981), we concluded that the purpose of 18 U.S.C. § 3005 (permitting anyone indicted for a "capital crime" to have two attorneys) was based on the "severity of the punishment rather than the nature of the offense" and therefore "the elimination of the death penalty eliminate[d] Dufur's right ... to a second court-appointed attorney." *Id.* at 515. We have applied this mode of analysis in a variety of cases. *See United States v. Goseyun,* 789 F.2d 1386, 1387 (9th Cir.1986) (*Goseyun* ) (20 peremptory challenges tied to penalty); *United States v. Steel,* 759 F.2d 706, 710 (9th Cir.1985) (purpose of law allowing defendant to obtain government witness list in "capital cases" is to reduce erroneous imposition of death; statute is thus tied to penalty).

Like the statute in *Kennedy,* and unlike the statutes in *Dufur, Goseyun,* and *Steel,* the statute of limitations provisions of sections 3281 and 3282 are inextricably tied to the nature of the offense. Congress has made the judgment that some crimes are so serious that an offender should always be punished if caught. Murder by mail bomb is one such offense. This means that *Cheely* did not effect the statute of limitations in sections 3281 and 3282, because those provisions derive their justification from the serious nature of the crime rather than from a concern about, for example, what procedural protections those who face a penalty as grave as death are to receive. Thus, we hold that section 1716 offenses are still punishable "at any time without limitation" notwithstanding *Cheely. See* 18 U.S.C. § 3281.

## IV

Manning asserts that certain evidentiary rulings resulted in a tainted conviction. He also argues that his cross-examination was unduly limited, and that an alleged *Brady* violation and governmental misconduct warrant dismissal of the indictment.

### A.

 First we review the disputed evidentiary rulings. Evidentiary rulings are reviewed for abuse of discretion. *United States v. Brooke,* 4 F.3d 1480, 1487 (9th Cir.1993). The district court's construction of the rules of evidence is reviewed de novo. *United States v. Diaz,* 961 F.2d 1417, 1419 (9th Cir.1992). Motions to suppress evidence are reviewed de novo. *United States v. Becker,* 23 F.3d 1537, 1539 (9th Cir.1994). Factual findings are reviewed for clear error. *Id.*

### 1.

 Manning argues that evidence of certain conversations between Adams (the intended victim) and Ross (who, under the government's theory, hired Manning) should have been excluded because they were hearsay and did not fall under the hearsay exception in Federal Rule of Evidence 801(d)(2)(E) (statements made by a coconspirator of a party during the course and in furtherance of the conspiracy are admissible). Manning argues that because he was not charged with conspiracy, the exception is inapplicable.

"A coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy, notwithstanding the fact that the indictment does not contain a conspiracy count. The question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture." *United States v. Layton,* 855 F.2d 1388, 1398 (9th Cir.1988) (internal quotations and citations omitted), *cert. denied,* 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989). Here, sufficient evidence existed to show that Manning and Ross were both involved in sending the bomb to Adams's office. The statements were therefore admissible.

2.

 Manning challenges the admission of his prior 1972 conviction, which was used to show that he had knowledge of explosive devices. Federal Rule of Evidence 404(b) allows evidence of "other crimes" to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 404(b) evidence must satisfy four requirements: (1) it must prove a material element of the offense for which the defendant is charged; (2) in certain cases the prior conduct must be similar to the charged conduct; (3) proof of the prior conduct must be based upon sufficient evidence; and (4) the prior conduct must not be too remote in time. *United States v. Arambula–Ruiz,* 987 F.2d 599, 602 (9th Cir. 1993). Furthermore, "we must analyze the evidence pursuant to Rule 403 and determine whether its probative value outweighs its prejudicial effect." *Id.*

The prior conviction was admissible under Rule 404(b). The conviction tended to show that Manning had knowledge and thus intent (an element of the offense charged). The 1972 conduct was similar enough to warrant admission as both crimes involved explosives. The 1972 conduct was established through a certificate of conviction as well as testimony of the investigating officer who worked on the 1972 case. Finally, the 1972 conduct occurred 8 years prior to the bombing here, and was thus not too remote in time. To lessen prejudice, the judge properly instructed the jury at the time the prior conviction was admitted that the "evidence of a prior bombing is only admitted for a limited purpose to show knowledge." This admonition reduced the possibility of prejudice and indicates that the district court balanced the probative value of the evidence against its possible prejudicial effect. *See id.* at 604. There was no abuse of discretion.

B.

 Manning argues that cross-examination was improperly limited with respect to Adams and Hall, the postal inspector who investigated the bombing. The district court's decision to limit the scope of cross-examination is reviewed for abuse of discretion. *United States v. Dischner,* 974 F.2d 1502, 1514 n. 12 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993). "The trial court does not abuse its discretion as long as the jury receives sufficient information to appraise the biases and motivations of the witness." *United States v. Guthrie,* 931 F.2d 564, 568 (9th Cir.1991), *quoting United States v. Feldman,* 788 F.2d 544, 554 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

Manning's attorney asked Adams about the names of other possible suspects that Adams had given to Inspector Hall, and asked Hall about 11 other suspects to the bombing. The Adams cross-examination fills over 70 pages of transcript, and Hall's cross-examination consumes over 250 pages of transcript. No evidentiary ruling by the district court unduly restricted either the scope of the cross-examination or the method by which Manning's attorney was trying to discredit the witnesses. The district court did not abuse its discretion by limiting the scope of cross-examination.

C.

 Manning alleges that the government withheld exculpatory material in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and engaged in misconduct during the trial and during closing argument. Alleged *Brady* vi-

olations are reviewed de novo. *United States v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993) (*Woodley* ). Motions to dismiss an indictment based on improper government conduct are reviewed de novo. *United States v. Smith*, 924 F.2d 889, 897 (9th Cir.1991).

### 1.

Manning alleges that the government withheld four items of exculpatory evidence: (1) a report showing that at least 18,000 boxes, from the batch from which the box containing the bomb was obtained, could not be accounted for; (2) a report showing that the bomb casing could have come from a different source; (3) an investigative report concerning a man named Glenn Pape who was identified as a suspect; and (4) a report by a language expert discussing the letter that accompanied the bomb and allegedly clearing Manning of the crime.

 A *Brady* violation occurs when the government withholds material, exculpatory evidence. *United States v. Zuno–Arce*, 44 F.3d 1420, 1425 (9th Cir.1995) (*Zuno–Arce* ). Evidence is material for *Brady* purposes only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different. *Woodley*, 9 F.3d at 777. "Although disclosure must be made when it is still of substantial value to the accused, the prosecution need not produce *Brady* material before trial." *Id*. We consider whether the material was exculpatory, whether it was produced when it should have been, and whether the failure to produce the exculpatory material timely mattered. *Zuno–Arce*, 44 F.3d at 1425.

 The report regarding the boxes is not exculpatory, because the only box that was relevant here was the box found in Adams's office that contained the bomb. That box had Manning's fingerprint on it. The casing report likewise was not exculpatory, because the government did not rely on the source of the bomb casing to convict Manning. Also, Manning has not shown how this report could have changed the result of the trial. The Glenn Pape report was potentially exculpatory, because it identified an alternative suspect. However, Manning has not shown any prejudice, as his counsel was able to discuss suspect Pape with Inspector Hall during cross-examination and again on recross-examination. Finally, the district court excluded the psycholinguistic report as unreliable. Manning does not explain how the report would have been exculpatory. The report simply gives what appears to be a "profile" of the bomber, and the district court had broad discretion to exclude it. *See United States v. Kupau*, 781 F.2d 740, 745 (9th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986).

### 2.

 Manning raises several issues relating to the admission of exhibit 147. Exhibit 147 is a letter by Manning to Special Agent David James requesting copies of Manning's FBI files. The letter was sent to James after an interview between James and Manning in which Manning told James that he had knowledge of bombs.

During the trial, the government wanted to have James testify about Manning's statements that he knew how to make bombs. At a suppression hearing, Manning asserted he was in custody when he told this to James.

The government then used exhibit 147 to impeach Manning's testimony at the suppression hearing. Manning was questioned about the letter he sent to James, in which he called James by his first name, beginning the letter "Dear David." The government was attempting to show that the tone of the letter did not support Manning's argument that he was in custody during the interview. The government at this time noticed that the letter was similar in format to the bomb letter, and sought the introduction of the letter as evidence of guilt. Manning did not object to the introduction of the letter to show similar format, but did object to the jury seeing the contents of the letter.

Manning argues that reversal is required because the government violated Federal Rule of Criminal Procedure 16 by failing to produce exhibit 147 before trial. Rule 16 provides that the government must, upon request, turn over any relevant written statements of the defendant. The government

concedes that the letter should have been produced before trial based on its similar format to the bomb letter. However, Manning has not demonstrated that he suffered prejudice as a result of the government's failure to produce the letter before trial. This claim must therefore fail. *United States v. Baker,* 10 F.3d 1374, 1398 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994).

Manning also objects to the subsequent admission of the letter as evidence of guilt. Manning argues that the letter was not properly authenticated, and that the admission of the letter constituted a constitutional error because Manning himself admitted at the suppression hearing that he prepared the letter and, pursuant to *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), a defendant's suppression hearing testimony cannot be used against him over his objection on the issue of guilt without depriving him of his Fifth Amendment privilege against self-incrimination.

Manning did not object to the admission of the letter on the ground that it was not properly authenticated until several days after James had finished testifying and had returned to New York. The government then filed a written opposition to the motion to strike which included a proffer as to authenticity. The government's proffer referred to Manning's admission at the suppression hearing that he had prepared the letter, but it also presented a number of facts known to Jones proving that Manning prepared the letter.

▇▇ Even if we were to conclude that Manning did not waive this argument by failing to raise a timely objection, Manning's contention that the admission of the letter violated his Fifth Amendment rights must nonetheless fail. The government never used Manning's testimony as direct evidence of guilt. In fact, it was never presented in any way to the jury. It was used solely to establish the admissibility of the letter and to demonstrate that Manning's belated objection on the grounds that the document had not been authenticated was not made in good faith. *Simmons* does not preclude all use of a defendant's suppression hearing testimony,

just use of such testimony on the issue of guilt. *Id.* at 394, 88 S.Ct. at 976. As the Supreme Court made clear in *Harris v. New York,* 401 U.S. 222, 222–26, 91 S.Ct. 643, 643–46, 28 L.Ed.2d 1 (1971), "[t]he shield provided by [the Fifth Amendment privilege against self incrimination] cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." Just as Manning's trial testimony could have been impeached by any prior inconsistent statements made at the suppression hearing, so could his belated motion to strike be rebutted by his own prior admissions at the suppression hearing proving that the document was authentic.

Authenticating a document requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." *See* Fed.R.Evid. 901(a). The government's proffer provides more than sufficient evidence to authenticate the letter. Indeed, Manning conceded that the proffered evidence was sufficient. Thus, even if the district court erroneously used Manning's suppression hearing testimony to authenticate the letter, the error was harmless.

### 3.

▇▇ Finally, Manning alleges that a misstatement by the prosecutor regarding the burden of proof during closing argument warrants reversal. He also alleges that the prosecutor gave the jury an example of circumstantial evidence that created a mandatory presumption against Manning. During closing argument, the prosecutor did misstate the burden, but no objection was made. We therefore review only for plain error. *United States v. Sehnal,* 930 F.2d 1420, 1425–26 (9th Cir.), *cert. denied,* 502 U.S. 908, 112 S.Ct. 300, 116 L.Ed.2d 244 (1991). The misstatement was obviously unintentional, and the court gave the jury the correct instructions on the burden of proof. Furthermore, there has been no showing of any intentional misconduct or that any of the prosecutor's statements during closing materially affected the verdict. Manning has failed to show reversible error in his prosecutorial misconduct claim. *See id.*

## V

Manning asserts that there was insufficient evidence to convict him. We will reverse a conviction on the basis of insufficient evidence only if, viewing the evidence in the light most favorable to the government, no rational jury could have found the elements of the crime beyond a reasonable doubt. *United States v. Lennick*, 18 F.3d 814, 818 (9th Cir.), *cert. denied*, ——— U.S. ———, 115 S.Ct. 162, 130 L.Ed.2d 100 (1994).

Viewing the evidence in the light most favorable to the government, a rational jury could have found Manning guilty. The position of the fingerprint on the box that contained the bomb along with Manning's wife's prints on the letter that accompanied the bomb were such that they "can be explained in a manner consistent with innocence only through far-fetched, unsupported speculation." *Taylor v. Stainer*, 31 F.3d 907, 909–10 (9th Cir.1994).

Manning's citation to *Mikes v. Borg*, 947 F.2d 353 (9th Cir.1991), *cert. denied*, ——— U.S. ———, 112 S.Ct. 3055, 120 L.Ed.2d 921 (1992), is misplaced because in *Mikes* fingerprints were the only evidence of guilt, and the item linking the defendant to the crime was accessible to the public and had other prints on it. The box in question here had no other prints. The location of the print underneath the adhesive tape that wrapped the box after the bomb was placed inside it was indicative of handling the box immediately prior to shipment. Also, the evidence supporting conviction consisted of more than Manning's fingerprints. It included evidence of motive and contact between Ross and Manning just prior to the bombing, evidence of Manning's knowledge of bombs and access to the box that contained the bomb, and Manning's wife's prints on the letter. Therefore, *Mikes* does not control. The evidence was sufficient to convict Manning.

## VI

Finally, Manning challenges his life sentence and parole eligibility date, arguing that only a jury could have imposed life, and that he should become eligible for parole after serving ten years. The legality of a sentence is reviewed de novo. *United States v. Pomazi*, 851 F.2d 244, 247 (9th Cir.1988).

### A.

The version of 18 U.S.C. § 1716 applicable to Manning provides that when death results Manning "shall be subject ... to the death penalty or to imprisonment for life, *if the jury shall in its discretion so direct.*" (Emphasis added.) In this case, the judge, not a jury, imposed the sentence of life imprisonment. Manning argues that this was error.

In an analogous situation, courts have concluded that 18 U.S.C. § 844(i) (prohibiting the destruction, by means of explosive devices, of property used in interstate commerce) can result in a life sentence, under the sentencing provisions of 18 U.S.C. § 34, only where a jury imposes the sentence. *See United States v. Prevatte*, 16 F.3d 767, 783 (7th Cir.1994); *United States v. Hansen*, 755 F.2d 629, 631 (8th Cir.), *cert. denied*, 474 U.S. 834, 106 S.Ct. 105, 88 L.Ed.2d 85 (1985); *United States v. Williams*, 775 F.2d 1295, 1299 (5th Cir.1985) (*Williams*), *cert. denied*, 475 U.S. 1089, 106 S.Ct. 1477, 89 L.Ed.2d 732 (1986). Section 34 contains language identical to section 1716. Like the crimes for which Manning was convicted, section 844(i)'s death penalty provisions have been invalidated. At sentencing, Manning's attorney asked the court for its basis for imposing life, and the court indicated that it disagreed with these "section 34" cases.

It is true that the plain language of section 1716, like section 34, indicates that a jury is to impose a life sentence after a jury trial. However, these section 34 cases do not necessarily control our analysis here, because in those cases section 844(i) specifically stated that if death results, the violator "shall also be subject to imprisonment *for any term of years, or* to the death penalty or to life imprisonment as provided in section 34 of this title." *See Williams*, 775 F.2d at 1299 (emphasis added). Therefore, section 844(i) gave specific directions that if a judge, rather than a jury, was to sentence a defendant for violating section 844(i) involving a death, the judge could give "any term of years" but not "life imprisonment" (which was reserved for

the jury under section 34). What differs about section 1716, however, is that where death results there is no provision at all that allows a judge to give "any term of years." Section 1716 removes all discretion from the sentencing process, vesting the sentencer with only two choices: death or life imprisonment.

In *Williams*, the court stated that "[t]he elimination of the death penalty provision [for section 844(i)] does not mean that the power to sentence a defendant [under section 34] has passed to the court and has been taken away from the jury." *Id.* But we see no reason such a statement need be true in the section 1716 death case context, where the only possible sentence for Manning is now life imprisonment.

Just as the elimination of the death penalty provisions of section 1716 did not affect the statute of limitations provisions of sections 3281 and 3282, it is equally clear that the elimination of the death penalty provisions did affect the role of the jury in sentencing a defendant under section 1716(h) where death resulted. There is no logical reason for requiring a jury to sentence Manning to life imprisonment when the relevant sentencing provision of section 1716 makes it clear that it is only in cases where the jury "shall in its discretion so direct" a life sentence *in lieu of a death sentence* that a jury is required. Put another way, with the elimination of the death penalty provisions of section 1716, jury "discretion" is no longer involved. Congress obviously intended that a defendant convicted under section 1716 of an offense "which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life." *See* 18 U.S.C. § 1716(h). We have invalidated the first option in *Cheely*, 36 F.2d at 1446, leaving the imposition of a life sentence the only possible sentence. With the death sentence eliminated, so too is the need for a sentencing jury. *See Goseyun*, 789 F.2d at 1387 (argument that the district court had no authority to sentence defendant to life because jury did not qualify its verdict as "without capital punishment" is meritless in light of the invalidity of the relevant death penalty provision). Therefore, whatever the merits of other cases with respect to sections 844(i) and 34, the only sensible reading to give section 1716(h), after our *Cheely* decision, is to allow a judge rather than a jury to impose the only possible punishment: life imprisonment.

## B.

The government agrees with Manning that the district court erred by ruling that Manning could not become eligible for parole for 30 years. 18 U.S.C. § 4205(a) provides that "a prisoner shall be eligible for release on parole ... after serving ten years of a life sentence ... except to the extent otherwise provided by law." This clearly means that a "person sentenced to life imprisonment must become eligible for parole no later than ten years after the commencement of incarceration." *United States v. Kinslow*, 860 F.2d 963, 969 (9th Cir.1988), *cert. denied*, 493 U.S. 829, 110 S.Ct. 96, 107 L.Ed.2d 60 (1989), *overruled on other grounds sub. nom. United States v. Brackeen*, 969 F.2d 827 (9th Cir.1992) (en banc). We conclude that the district court erred by imposing a minimum term before which Manning could become eligible for parole in excess of ten years. Remand is therefore required.

Manning's conviction and life sentence are affirmed. His parole eligibility date is vacated, and remanded for the district court to correct Manning's parole eligibility.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**