92 F.3d 1194
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
William Ralph ARCHER, Defendant-Appellant.
 No. 93-10753.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 17, 1995.
Decided July 26, 1996.
 
 1
 Before: GOODWIN, HAWKINS, Circuit Judges, and FITZGERALD*, District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 William Ralph Archer appeals his conviction and sentence, following a jury trial, for conducting a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848; conspiracy to manufacture, possession with intent to distribute, and to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846; distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1); and, use of a firearm in a drug trafficking crime in violation of 18 U.S.C. § 924(c).
 
 
 4
 We have jurisdiction under 28 U.S.C. § 1291 and we reverse in part and affirm in part.
 
 
 5
 I. Facts.
 
 
 6
 In June of 1992, a wiretap was placed on the telephone of Ron Stevens, a Las Vegas drug dealer. William Ralph Archer was overheard on the wiretap negotiating for the sale of one-half pound of methamphetamine[1] to Stevens. Both Archer, and his ex-girlfriend, Naomi Webb, engaged in numerous telephone conversations with Stevens to arrange the deal. Archer's wife, Cheri Wheeler, was subsequently observed by surveillance agents as she delivered narcotics to Stevens' residence and returned to Archer's residence. Stevens then sold the half pound of methamphetamine to Neil McGregor, an informant working with local police and the Drug Enforcement Administration.
 
 
 7
 Given these events, an investigation was launched to investigate Archer's activities involving narcotics. At trial witnesses described a series of factual episodes which are relevant to Archer's conviction for conducting a continuing criminal enterprise or CCE.
 
 Archer's Modus Operandi
 
 8
 Several witnesses testified that Archer would typically conduct conversations involving narcotics transactions one-on-one in his bedroom.[2] This practice ensured that if something went wrong, it would be Archer's word against the other person's. In addition, Lewis and Webb both testified that Archer commonly shared methamphetamine with his associates free of charge in his bedroom.
 
 
 9
 Naomi Webb testified that she was in Archer's house when Archer gave the half-pound of drugs to Wheeler for her to deliver to Stevens. Webb further testified that she was at Archer's house when Wheeler returned and took money out of her purse for Archer. This testimony gives additional credence to the narcotics transaction between Archer and Stevens witnessed by law enforcement agents.
 
 
 10
 The "Botched Cook"
 
 
 11
 Several witnesses testified to seeing what appeared to be methamphetamine in the form of a thick red oil at Archer's residence. John Lewis testified that this methamphetamine was the result of a "botched cook" and that Archer had at least ten pounds of the substance in an Igloo cooler.
 
 
 12
 Naomi Webb stated that Archer and an individual known as Richy Rich possessed four quarts of a substance that had the appearance of strawberry jelly. Webb testified that often Richy Rich would dip his knife into this "red phosphorus" and offer to put it on the tongue of whomever wanted it. Webb further testified that she found more of this substance when looking for jam to make peanut butter and jelly sandwiches. When she opened the lid of a jar and smelled a noxious odor, she threw the substance away. When Archer discovered that the substance had been thrown out by Webb he slashed her finger with a knife.
 
 
 13
 A defense chemist explained on cross-examination that such a substance could result from an accident in the methamphetamine manufacturing process, if when using red phosphorous, the methamphetamine was overheated.
 
 The Incident at Evan's
 
 14
 Sometime in September or October of 1990, Archer directed Lewis to give Evan, a neighbor, a quarter ounce of methamphetamine oil in exchange for the painting of a motorcycle. John Lewis testified that Archer became upset with him for giving Evan too much methamphetamine and because Evan had been neglecting the painting job.
 
 
 15
 According to Lewis, Archer drove his pickup through the gate of Evan's residence armed with a .357 Magnum revolver in his belt. Archer spotted Lewis and challenged him to go for his derringer (which Lewis always carried since trading a sawed-off twelve gauge shotgun to Archer for the derringer). As tempers eased Lewis noticed William "Chico" Szabo in an alley covering the situation with Lewis' old sawed-off shotgun. Lewis also spotted John "Weird Walter" Orme standing on the roof of Archer's residence armed with a fully automatic AK-47.
 
 
 16
 When Orme came down from the roof Archer confronted Orme with the .357 Magnum because Archer noticed muddy footprints leading toward his safe. Archer then gave Lewis the .357 and told Lewis to keep it pointed at Orme until he checked the money in his safe. Lewis testified that when Archer returned he took away the .357 and fired a round directly in front of Orme's face. Their friendship restored, the episode ends with everyone snorting methamphetamine together.
 
 
 17
 The government used this incident to demonstrate Archer's narcotics trafficking (trading methamphetamine for a paint job), his direction of others (Szabo and Orme as backup), his use of force or intimidation (against Lewis and Orme), and his use of firearms in connection with drug trafficking.
 
 Lewis' Trip to Minnesota
 
 18
 Around Christmas in 1991, Lewis testified that he drove a U-Haul truck from Las Vegas to Minnesota for Ron Sullivan. Before leaving Archer's compound the truck had been loaded with boxes containing methamphetamine lab equipment by Lewis, Sullivan, and Gregory (Buck) Bowen. Archer told Lewis to drive the U-Haul to Minnesota and asked Lewis to drive by way of Albuquerque, New Mexico to deliver chemicals.
 
 
 19
 Once in Minnesota Ron Sullivan and his father accompanied Lewis to a U-Haul facility where Lewis wiped the truck down for fingerprints and left it without paying. The U-Haul dealer in Minnesota corroborated that an abandoned truck was discovered in his lot and that rental records showed that it had been rented by Ron Sullivan.
 
 
 20
 Lewis testified that he later watched Ron Sullivan wrap methamphetamine within a package of deer meat which was mailed to Cheri Wheeler in Las Vegas pursuant to Archer's instructions. The government introduced a Northwest Airlines airbill for a package shipped to Cheri Wheeler.
 
 
 21
 Sullivan's wife, Virginia, when interviewed by Det. Mike Bryant at her home, admitted that her husband Ron was addicted to methamphetamine. She stated that her husband's trouble with law enforcement was related to his association with Bill Archer and John Lewis. Virginia Sullivan stated that her husband received free methamphetamine from Bill Archer. She further stated that she had once seen her husband in possession of an amount of red gooey methamphetamine and that she warned him not to ingest it. He did take it, however, and apparently suffered no ill effects. When Virginia Sullivan testified at trial her testimony was similar to what she had said to Det. Bryant, though she omitted any reference to Bill Archer.
 
 
 22
 Naomi Webb, Archer's longtime girlfriend, testified that in June of 1992 Archer asked her to send a package by UPS to Ron Sullivan in Minnesota containing painting equipment and two eight-balls of methamphetamine. She refused and so William Szabo sent the package via UPS for Archer.
 
 The Albuquerque and Denver Connections
 
 23
 John Lewis testified that he often made trips to Albuquerque, New Mexico and Denver, Colorado in which he transported methamphetamine oil and cash at Archer's direction.
 
 
 24
 Lewis testified that after his trip to Minnesota, Archer asked Lewis to travel to Albuquerque to pick up $5,000 and return with the money to Las Vegas. Lewis did so and received $500 for his efforts. Archer then asked Lewis to return to Albuquerque to meet an man named Bullet and then travel with him to Denver. Lewis testified that he was taken to a ranch near Littleton, Colorado on the outskirts of Denver where he was introduced to three individuals known as Randy, Fuzzy and Kicker. In the kitchen at the ranch Lewis saw beakers and other glassware used in the manufacture of methamphetamine. After this first meeting, Lewis testified that he made many trips between Las Vegas and the ranch in which he would pick up money in Colorado and deliver it to Bill Archer.
 
 
 25
 On one occasion Lewis traveled to the ranch near Littleton and picked up $48,000 in cash and two mayonnaise jars of methamphetamine oil from Fuzzy and Randy. Archer had instructed Lewis to take the thick clear oil to Albuquerque and then return with the money to Las Vegas. En route, Lewis was arrested for driving under the influence of alcohol and his suitcases containing the contraband were impounded while he served ten days in jail. Upon his release, Lewis testified that he delivered the methamphetamine oil in Albuquerque and returned with the money to Bill Archer. Archer paid Lewis $1,000 for the run.
 
 
 26
 On direct examination, Lewis testified that Archer instructed him to pick up cash from Randy, Fuzzy, Bullet, and Kicker, to debrief them, to make sure they were in control of themselves and not getting too high, and to ensure that Archer was not getting ripped off. Lewis stated that these trips occurred during a six to eight month period in mid-1992 and that during that time Lewis delivered approximately $200,000 to $250,000 to Archer as a result of methamphetamine trafficking.
 
 
 27
 The physical evidence obtained during the execution of the search warrant at Archer's residence is not contested on appeal. Weapons including a double-barreled shotgun, a .357 magnum revolver, and an AR-15[3] assault rifle were recovered from Archer's home. Electric dynamite caps, brass knuckles, and a police scanner were also recovered. A DEA agent who searched Szabo's pants recovered a small vial which when analyzed was found to be methamphetamine.
 
 
 28
 II. Argument.
 
 
 29
 Archer contends that there was insufficient evidence to support counts I, IV and V of his conviction. We review the evidence in the light most favorable to the prosecution in determining whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 30
 The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or insubstantial on its face. United States v. Lai, 944 F.2d 1434, 1440 (9th Cir.1991), cert. denied, 502 U.S. 1062 (1992).
 
 
 31
 A. Continuing Criminal Enterprise.
 
 
 32
 To obtain a conviction under the Continuing Criminal Enterprise (CCE) statute, 21 U.S.C. § 848, the government must prove that a defendant acts as the organizer, supervisor or manager of five or more persons engaged in continuing violations of federal narcotics laws and, as a result, obtains substantial income from the illegal enterprise. United States v. Garcia, 988 F.2d 965, 967 (9th Cir.1993).
 
 
 33
 We have previously held that in order to satisfy the management of five or more persons element of a CCE charge, the jury must be unanimous on the five or more persons the defendant is found to have controlled if some of the people name could not, as a matter of law, have been organized by the defendant. United States v. Jerome, 942 F.2d 1328, 1331 (9th Cir.1991). This unanimity requirement has not been followed by any other circuit.
 
 
 34
 This court has also determined that selling narcotics to a regular buyer is not enough to properly establish organizing, supervising or control under the statute. United States v. Delgado, 4 F.3d 780, 785 (9th Cir.1993). Delgado requires the appellate court to analyze whether the defendant exercised control over the individuals named in the indictment. Id. When the Delgado court subtracted the drug customers from the listed individuals in the indictment, there were at most four individuals that Delgado could have possibly controlled. Therefore, reversal of the CCE count was required in Delgado.
 
 
 35
 The indictment in the present case named fifteen individuals that Archer either managed, controlled or supervised. These individuals were identified as: Ron Sullivan, Randy Rezac, Samuel Jasper, William "Chico" Szabo, John "Weird Walter" Orme, Naomi "Toy" Webb, Cheri Wheeler, Fuzzy, Kicker, Bullet, Alan "Tazz" Wade, Vern Wade, Ron Stevens, and Gregory "Buck" Bowen.
 
 
 36
 Archer concedes that he controlled Naomi Webb and Cheri Wheeler. John Lewis testified that he was paid to work for Archer. The jury heard testimony that William "Chico" Szabo and John "Weird Walter" Orme were frequently under Archer's supervision and that they served as armed backup when Archer stormed Evan's property. Lewis testified that Randy Rezac, Fuzzy, Bullet, and Kicker manufactured methamphetamine in Colorado for Archer and that Lewis was instructed by Archer to instruct, collect money, and ensure that Archer was not being ripped off by these individuals. Lewis testified that Ron Stevens and Gregory "Buck" Bowen assisted him in loading boxes of glassware for manufacturing methamphetamine in the back of a U-Haul at Archer's direction.
 
 
 37
 There is significant evidence that Archer controlled at least the first eight individuals named in the preceding paragraph and possibly all ten. The problem is that there is not significant evidence against Samuel Jasper, Alan "Tazz" Wade, and Vern Wade. Even more significantly, the only evidence against Ron Stevens, the drug dealer whose wiretapped telephone played a part in the initial investigation of this case, is that he purchased significant amounts of methamphetamine from Archer on a regular basis. Under Delgado, Stevens cannot be counted toward the five individuals Archer was accused of managing, organizing, or controlling.
 
 
 38
 In United States v. Barona, 56 F.3d 1087 (9th Cir.1995), cert. denied, 116 S.Ct. 814 (1996), we held that where individuals are named that the defendant is said to supervise, organize, or control, but the government concedes that as a matter of law the jury could not consider these individuals, reversal is required. Id. at 1096-1098. Barona holds that if the jury was presented with individuals who "were, as a matter of law, incapable of being counted as supervisees, the jury needed to be instructed of this." Barona 56 F.3d 1097. "The problem is that, among the list of people who the jury was told that it could choose, there existed individuals that the jury was not allowed to choose as a matter of law." Id.
 
 
 39
 Barona, requires the district to analyze whether the individuals listed in the indictment that the defendant is alleged to have organized, supervised, or controlled could be controlled as a matter of law. The district court must instruct the jury that a person is a supervisee only if the defendant exercised managerial control over that person. Barona, 56 F.3d at 1097.
 
 
 40
 Failure to instruct the jury that, as a matter of law, Ron Stevens could not be counted toward the five supervisees requires the jury's verdict on the CCE count be reversed in this case.
 
 B. Use of Firearms in Drug Trafficking
 
 41
 Count 4 of the indictment charges that between December 1, 1991 and July 14, 1992, Archer used six weapons in relation to the charge contained in Count 1. Count 5 alleges that between December 1, 1991 and July 14, 1992, Archer used those same weapons in relation to the charge contained in Count 2, conspiracy to posses, manufacture and distribute methamphetamine.
 
 
 42
 Because we are required to reverse Archer's CCE (Count 1) conviction, we are likewise required to reverse the § 924(c) charge dependant upon the CCE charge (Count 4). United States v. Andrews, 75 F.3d 552, 557 (9th Cir.), cert. denied, 116 S.Ct. 1890 (1996).
 
 
 43
 The government contends that Archer failed to properly preserve this issue for appeal by failing to make a Rule 29(a) motion before the district court. The government's contention is without merit. On the fifth day of trial Archer adequately raised this issue below.
 
 
 44
 The recent Supreme Court case of Bailey v. United States, 116 S.Ct. 501 (1995), has established the requirements that the government must prove in order to obtain a conviction under 18 U.S.C. § 924(c). Prior to Bailey, the government had to prove that a defendant used a firearm during and in relation to the drug offense by merely possessing the firearm in the same household with drugs. The jury needed only to decide that the possessed gun could have played a role in the crime. United States v. Torres-Rodriguez, 930 F.2d 1375, 1385 (9th Cir.1991).
 
 
 45
 Reviewing the facts in the light most favorable to the prosecution, the testimony at trial established that Archer always carried firearms, usually a handgun he kept in his belt. Archer kept several other weapons in his possession strategically located in his bedroom.
 
 
 46
 Bailey instructed that "[a] defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without its more active employment, is not reasonably distinguishable from possession." Bailey, 116 S.Ct. at 508. We have recently interpreted Bailey to find that "[e]ven if the Government were to argue that [the defendant] was keeping the gun at the ready for protection in connection with the drug offense, the conviction cannot stand." United States v. Garcia, 77 F.3d 274, 277 (9th Cir.1996).
 
 
 47
 At the incident at Evan's house Archer pointed his .357 Magnum at Lewis, and then instructed Lewis to keep the weapon pointed at Orme. We conclude that because Archer brandished his weapon as a result of a methamphetamine transaction with Evan, this constitutes active employment of a firearm and therefore violated 18 U.S.C. § 924(c). The fact that Archer pointed his gun at his supervisees is irrelevant. Archer was enraged because his methamphetamine deal with Evan was not to his liking. We affirm count five of the indictment.
 
 C. Sufficiency of the Indictment
 
 48
 The sufficiency of an indictment is reviewed de novo. United States v. Alber, 56 F.3d 1106, 1111 (9th Cir.1995).
 
 
 49
 Archer contends that the indictment was flawed because the time frame charged in Count 2 was open ended. The government contends that Archer cannot raise this issue now as he failed make a specific objection to Count 2 before the trial court. Archer's codefendant Wheeler did file a motion, which Archer failed to join, seeking the dismissal of Count 2. A magistrate judge in his report and recommendation found the indictment to be adequate because it contained a sufficiently identifiable time and because it was reasonably particular. The district court agreed and denied the motion objecting to Count 2.
 
 
 50
 Archer relies upon United States v. Cecil, 608 F.2d 1294 (9th Cir.1979), in which this court held that an indictment was fatally defective because it did not contain specific facts or circumstances pertaining to the conspiracy. Id. at 1296-97. Cecil is distinguishable. The appellants in Cecil, unlike Archer, raised timely objections to the indictment. Id. at 1296. Additionally, the indictment in this case, unlike that in Cecil, contains overt acts which provide a limiting focus. The defense team in this case also received a Bill of Particulars. Archer was presented with a discrete time period enabling him to prepare an adequate defense. See United States v. Laykin, 886 F.2d 1534 (9th Cir.1989), cert. denied, 496 U.S. 905 (1990) (open-ended indictment not defective because it listed overt acts). Accordingly, Archer suffered no prejudice. See United States v. Normandeau, 800 F.2d 953, 958 (9th Cir.1986) ("The key question in these inquiries is whether an error or omission in an indictment worked to the prejudice of the accused.")
 
 
 51
 Archer also contends that the court allowed the conspiracy count to be constructively amended by adding language to a jury instruction specifying the dates of the alleged conspiracy. The government correctly notes that this issue was never raised before the district court. Archer did make a motion to limit the evidence of drug activities to the dates 1988 forward. The district court granted Archer's motion and later stated that he intended to instruct the jury that the conspiracy count (Count 2) should be limited to the years 1988 forward. Archer's counsel agreed. The district court committed no error and Archer suffered no prejudice.
 
 D. Admission of Archer's Prior Bad Acts
 
 52
 The admission of evidence of other crimes pursuant to Fed.R.Evid. 404(b) is reviewed for an abuse of discretion. United States v. Moorehead, 57 F.3d 875, 878 (9th Cir.1995).
 
 
 53
 The government contends that the potentially prejudicial evidence that Archer is objecting to on appeal was admitted by the defense team and is therefore not reviewable on appeal. The government is correct.
 
 
 54
 In his opening argument counsel for Archer refers to the defense team's strategy of admitting "incredible stories" in order to discredit the government's witnesses. Counsel for codefendant Szabo subsequently admitted evidence that Archer was an ex-Hessian motorcycle gang member as well as its former president. Archer's counsel during cross-examination of Naomi Webb elicited testimony that: (1) she had seen an individual she thought was Norman Mills beaten to death at Archer's residence in 1973, and that he was then placed in a 55 gallon drum and deposited into a mine shaft; (2) that Norman Mills was then president of the Hessians; (3) that a young girl who was being sexually molested was missing she believed was placed in a drum and deposited in a mine shaft; (4) that a State of Nevada judge named Brown delivered a briefcase full of cash to Archer; (5) that Cheri Wheeler had told Webb that she and Archer had killed Wheeler's ex-husband; (6) that Archer sexually abused his daughter Anita; and (7) that Wheeler had threatened to cut Webb's throat and leave her in the desert, among other potentially prejudicial information. Counsel for Szabo in his cross-examination of Webb also developed that same evidence of misconduct. The defence's apparent strategy was to elicit these allegations from Webb and then claim that the government's investigation was inadequate, thus discrediting Webb and the government's case against Archer. Archer cannot now claim that the court erred in admitting this evidence. Shorter v. United States, 412 F.2d 428, 431 (9th Cir.), cert. denied, 396 U.S. 970 (1969) (bad acts offered by defense not objectionable on appeal).
 
 
 55
 The government did introduce evidence that Archer distributed user quantities of drugs free of charge to associates and also introduced the incident in which Archer requested that Lewis hold a .357 magnum on Orme while Archer checked the contents of his safe. The government contends that these incidents were relevant to narcotics trafficking and as evidence of methods of control employed by Archer. We conclude that the evidence was relevant and that the district court did not abuse its discretion in admitting this evidence.
 
 E. Admission of Prior Consistent Statements
 
 56
 We review a district court's evidentiary rulings made during trial for an abuse of discretion. United States v. Manning, 56 F.3d 1188, 1196 (9th Cir.1995).
 
 
 57
 Archer contends the district court abused its discretion by admitting Webb's prior consistent statement in admitting the testimony of Det. Bryant to whom Webb had given a statement. The government states that it offered Bryant's testimony in order to rebuke the defense's assertion that Webb was subject to flights of fantasy and cites United States v. Lujan, 936 F.2d 406 (9th Cir.1991). In Lujan, the defendant cross-examined a government witness about her statements made to an officer. The court found that by doing so, the defendant opened the door to allow the officer to testify about the statements made to him. Such testimony was found to be properly admitted in order to rebut a charge of improper influence or motive. The facts in this case are nearly identical and Lujan do provide for the admission of Bryant's testimony.
 
 F. Exclusion of Evidence
 
 58
 We review a district court's evidentiary rulings made during trial for an abuse of discretion. United States v. Manning, 56 F.3d 1188, 1196 (9th Cir.1995).
 
 
 59
 Archer contends that the district court abused its discretion by not admitting court records that showed Judge Brown had sent Archer to jail for contempt of court. The district court ruled that the evidence was irrelevant unless the defense called Judge Brown to testify.
 
 
 60
 Archer contends that the records were relevant to show that Webb's testimony that Judge Brown used Archer as a source of drugs lacked credibility. Archer believes that no judge would convict his source for drugs. This argument defies logic. The best evidence of Judge Brown's relationship with Archer could have been developed by calling Judge Brown to the stand. The defense elected not to call Judge Brown. Therefore, the district court did not abuse its discretion by refusing to admit Archer's record of conviction without first calling Judge Brown as a witness.
 
 G. Prosecutorial Misconduct
 
 61
 Archer contends that the prosecution committed misconduct by referring to the defense's plan that attempted to show that there were some ugly things lurking in the community that remained unresolved. Archer also contends that the government improperly bolstered their witnesses by stating that the agents never put words into the witnesses mouths.
 
 
 62
 A trial court's ruling on prosecutorial comments is reviewed for an abuse of discretion. United States v. Santiago, 46 F.3d 885, 892 (9th Cir.), cert. denied, 115 S.Ct. 2617 (1995). Whether such comments constitute improper "bolstering" is a mixed question of law and fact reviewed de novo. Id.
 
 
 63
 The first comment that the government made, "that there are some ugly things lurking in the community that remain unresolved." Was made as a reference to the defense's trial strategy. Archer's attorney stated in opening argument that:
 
 
 64
 There's a lot more coming as far as witnesses and their statements, and some incredible stories that they're going to tell you. And I say incredible because on the defense team we're going to show you, and pick apart these statements and give you illustrated examples of how they're just fabrications.
 
 
 65
 The government was addressing the defense's plan and then stated that this plan had failed. Admission of the government's statement was not an abuse of discretion.
 
 
 66
 Archer's second argument, that the government vouched for the credibility of officers when the government referred to their practice of not putting words into the mouths of witnesses is also without merit. This is not witness vouching, it is simply the government explaining to the jury that testimony harmful to Archer and corroborated by several individuals is corroborated testimony and is not influenced by government agents.
 
 
 67
 H. Estimate of Archer's Methamphetamine Sales at Sentencing
 
 
 68
 The district court's factual findings in the sentencing phase are reviewed for clear error. United States v. Fuentes-Mendoza, 56 F.3d 1113, 1116-17 (9th Cir.), cert. denied, 116 S.Ct. 326 (1995).
 
 
 69
 Archer contends that there is no competent testimony to base Archer's methamphetamine sentence at a level of 100 grams.
 
 
 70
 The DEA chemist testified at sentencing that a quart jar of methamphetamine oil would yield 1.8 pounds of methamphetamine oil or about 2.2 pounds of methamphetamine salt. Thus, one quart of meth oil would convert to one kilogram of pure methamphetamine. The court noted that Naomi Webb had testified to seeing four quarts of meth oil and John Lewis had testified regarding two bottles of meth oil he transported from Denver to Albuquerque. Lewis also testified that Archer possessed an igloo cooler full of red meth oil. The court then concluded that given this evidence, 100 grams of pure methamphetamine was a conservative estimate of the amount of meth distributed by Archer.
 
 
 71
 United States Sentencing Guideline § 2D1.1. Application Note 12 states:
 
 
 72
 Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. See § 1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.
 
 
 73
 The district court was required to make some estimation of the quantity of drugs distributed by Archer. We find that the district court did not commit clear error in determining that Archer had distributed 100 grams of methamphetamine given the testimony at trial.
 
 
 74
 III. Conclusion.
 
 
 75
 We reverse Counts One and Four and affirm Counts Two, Three and Five of the Indictment and remand to the district court.
 
 
 76
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 HAWKINS, Circuit Judge, concurring:
 
 77
 I concur in the memorandum.
 
 
 78
 Prior to argument, we alerted Archer and the government to be prepared to argue the applicability of Barona to the facts of the appeal. Because the government failed to inform us in what respect Samuel Jasper, Alan "Tazz" Wade, and Vern Wade were anything but customers of Archer, we are compelled under Barona and Delgado to reverse Archer's Continuing Criminal Enterprise conviction. Perhaps the arguments were not there to be made. In that case, the memorandum rests on very firm ground. If, on the other hand, the arguments were there to be made, it is most unfortunate for this is a very serious crime and it merited the government's most serious attention.
 
 
 
 *
 The Honorable James M. Fitzgerald, Senior U.S. District Judge for the District of Alaska, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Chemical analysis of the half-pound of drugs revealed that instead of methamphetamine, the substance was actually amphetamine at a purity rate of 29 percent. However, that factual distinction is not relevant for the purpose of this appeal
 
 
 [2]
 These witnesses were: John Lewis, Gary Gray, Edward Duncan, Michelle Shields, and Naomi Webb
 
 
 [3]
 Lewis testified that this rifle was an AK-47