[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 3, 2010
JOHN LEY
CLERK

_____

No. 08-13339

_____

D. C. Docket No. 00-00425-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SAMUEL KNOWLES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 3, 2010)

Before BIRCH, MARCUS and BALDOCK,[*] Circuit Judges.

PER CURIAM:

---

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Samuel Knowles appeals his convictions and sentences for conspiracy to import cocaine and conspiracy to possess with the intent to distribute cocaine. After review of the record and consideration of the parties' written submissions and oral arguments, we AFFIRM.

## I. BACKGROUND

Federal grand juries sitting in the Southern District of Florida returned two separate indictments against Samuel Knowles, a citizen of the Commonwealth of the Bahamas, charging him with multiple offenses arising out of a large-scale drug-trafficking conspiracy. In May 2000, the grand jury returned the indictment in this case ("Case 425"), which charged Knowles and eight other individuals with conspiring to import cocaine from June 1995 to April 1996, in violation of 21 U.S.C. §§ 952(a), 960(a)(i), and 960(b)(1)(B)(ii), all in violation of 21 U.S.C. § 963 (Count 1), and conspiring to possess with intent to distribute cocaine from June 1995 to April 1996, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii), all in violation of 21 U.S.C. § 846 (Count 2).[1] The second indictment was returned in December 2000. The indictment in that case ("Case 1091"), charged Knowles and ten other individuals with drug-trafficking offenses that occurred between 1997 and 2000. Knowles filed an application for writ of

---

[1] Although the indictment charged Knowles on four other counts, those counts were dismissed upon the government's motion following his conviction.

habeas corpus in Case 1091, which was ultimately successful, barring extradition on the charges in the December 2000 indictment.

On 6 February 2002, almost immediately after the grant of Knowles' habeas application in Case 1091, a provisional warrant for Knowles' arrest was issued in Case 425. The United States government formally requested Knowles' extradition in Case 425 by Diplomatic Note on 18 March 2002.[2] In response thereto, a magistrate judge entered an Order of Committal on 16 December 2002, committing Knowles to custody to await extradition in Case 425. Knowles appealed the magistrate judge's committal order and filed an application for writ of habeas corpus with the Supreme Court of the Bahamas[3] on the grounds that the Bahamian Attorney General's extradition request was an abuse of discretion. The Supreme Court dismissed Knowles' application in May 2003 and ordered him extradited. On 21 May 2004, while Knowles' appeal from the dismissal of his habeas application was pending, the Supreme Court issued an order upon the consent of Knowles' counsel, counsel for the Minister of Foreign Affairs, and the Attorney

---

[2] On 31 May 2002, former president George W. Bush designated Knowles as a "foreign narcotics kingpin" under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901 *et seq*. ("Kingpin Act").

[3] The Supreme Court is the lowest level court in the Bahamian court system. The Court of Appeal is the intermediate court, and the Privy Council is the highest level appellate court.

General of the Bahamas, prohibiting Knowles' extradition "until all legal processes are complete in respect of both extradition applications against him." R1-84-2 at 2.

The Court of Appeal subsequently dismissed Knowles' appeal, and the Privy Council affirmed on 24 July 2006. In its order, the Privy Council noted that Knowles had filed a second application for habeas corpus on the grounds that he could not receive a fair trial in the United States due to his "kingpin" designation under the Kingpin Act, and that this application was still pending before the Supreme Court. The Supreme Court set Knowles' "kingpin" habeas application for argument on 18 August 2006.

On 28 August 2006, the Minister of Foreign Affairs signed a Warrant of Surrender authorizing Knowles' extradition to the United States, pursuant to section 12(1) of the Bahamas' Extradition Act. A Schedule of Charges attached to the warrant specified that the Bahamas was surrendering Knowles to the United States on the charges set forth in Case 425, that is, conspiracy to possess with intent to supply cocaine and conspiracy to import cocaine. A 4 September 2006 diplomatic note further clarified that Knowles "was surrendered pursuant to the Warrant of Committal, dated 16th December 2002, issued by Magistrate Carolita Bethell," and that "[t]he said Warrant was issued pursuant to the Order of

4

Committal also dated 16th December 2002 and also made by the said Magistrate."
R1-86-2 at 4.

On 28 September 2006, the Supreme Court of the Bahamas dismissed Knowles' request that he be returned to the Bahamas pending resolution of his kingpin application. Citing the Privy Council's 2005 decision in Noel Heath, Glenroy Matthew v. United States, 2005 WL 3299098 (Privy Council), in which the Privy Council had held that a habeas petition on "kingpin" grounds was "impossible,"[4] the Supreme Court determined that Knowles' habeas petition was complete because, given the Privy Council's precedent, "all legitimate avenues [for pursuing his kingpin application] [had been] shut off." R1-84-2 at 53. Inasmuch as Knowles' kingpin application was "positively doomed to fail," bringing him back to the Bahamas to complete the legal process on his application would be futile. Id. at 55-57. The court concluded that "Knowles ha[d] reached the end of the road. He, and his counsel . . . have fought a long hard fight, and with considerable credibility. But it is over. No extra time is allowed." Id. at 59.

---

[4] In Matthew, the Privy Council rejected the appellants' argument that their "kingpin" designations under the Kingpin Act would preclude them from receiving a fair trial in the United States on charges of conspiracy to import cocaine. The Privy Council found that this argument was "impossible" because "[t]he proper forum for a complaint about publicity is the trial court," and, moreover, "[a]ttempts to pre-empt decisions on such matters, whether arising through delay or otherwise, would directly conflict with the principles of comity on which extradition is based." Matthew, 2005 WL 3299098 (quotation marks and citations omitted).

In January 2007, Knowles moved to dismiss the indictment, arguing that he was extradited in violation of the 21 May 2004 Consent Order, the Bahamian Extradition Act of 1994,[5] and the Extradition Treaty between the Bahamas and the United States.[6]  Specifically, he argued that because the Extradition Act prohibits a person in custody from being extradited if proceedings on a habeas corpus application are still pending, his extradition during the pendency of his kingpin application was unlawful.  Because his extradition was contrary to the Extradition Act and Consent order, he argued, it violated the Extradition Treaty, which permits extradition only where the "executive authority of the Requested State *in*

_____

[5] Section 11(2)(b) of the Extradition Act of 1994 provides that "[a] person committed to custody under section 10(5) shall not be extradited under this Act . . . if an application for habeas corpus is made in his case, so long as proceedings on the application are pending."  R1-84-2 at 77.

[6] The U.S.-Bahamas Extradition Treaty provides, inter alia:

> (1) A person extradited under this Treaty may only be detained, tried, or punished in the Requesting State for the offenses for which extradition was granted, or –
>
> (a) any offense committed after the extradition;
>
> (b) any offense in respect of which the executive authority of the Requested State, in accordance with its laws, has consented to the person's detention, trial, or punishment; and for the purposes of this subparagraph the Requested State shall require compliance with the extradition procedures specified in Article 8 and the submission of the documents specified in that Article.

R1-84-2 at 104-05.

6

*accordance with its laws*, has consented" to extradition. R1-84 at 4 (citing Article 14 of the Extradition Treaty, *see* R1-84-2 at 105.).

The district court denied the motion on 1 March 2007. The court agreed that both the Extradition Act and the Consent Order prohibited extradition during the pendency of a habeas application, but concluded, as had the Bahamian Supreme Court in its 28 September 2006 order, that the arguments raised in Knowles' kingpin application were "undisputedly . . . moot" in light of Matthew. R1-94 at 5. Inasmuch as Knowles' "legitimate habeas proceedings ha[d] been completed," extradition did not violate the Extradition Act or the Consent Order. Id. at 6. The district court further rejected Knowles' argument that his extradition violated the Extradition Treaty, concluding that it was "undisputed that [the Minister of Foreign Affairs' 28 August 2006 Warrant of Surrender ] was issued pursuant to the extradition requests made by the United States for the crimes charged in [Case 425]," and therefore, that "extradition was granted for prosecution of the offenses charged in [Case 425]." Id. at 7.

Prior to the district court's resolution of Knowles' motion to dismiss, the government filed a notice indicating its intent to introduce evidence related to Knowles' drug trafficking activities from the mid-1980's through 2001. Specifically, the government sought to introduce, inter alia, evidence that:

(f) In or about June 2000, at the direction of Knowles, Hanna and others attempted to deliver 1164 kilograms of cocaine and 879 pounds of marijuana to co-conspirator Jesus Alonso in Miami. United States Customs agents, however, seized the narcotics in the area of Dinner Key off the coast of Florida;

(g) On or about July 24, 2000, DEA agents seized $2,563,260 of Knowles' drug proceeds from co-conspirator Frank Cartwright in Miami, Florida. [Royal Canadian Mounted Police] wire intercepts revealed that Knowles communicated with Frank Cartwright after the DEA seized the drug proceeds;

(h) In or about August 2000, an airplane carrying $400,000 in Knowles' drug proceeds departed from Opa Locka, Florida and landed in Freeport, Bahamas. When the Royal Bahamian Police Department attempted to stop co-conspirator Brian Bethel, a shootout ensued and Bethel escaped. RCMP wire intercepts captured Knowles and Bethel discuss the fact that the money had not been seized; and

(i) In or about early 2001, co-conspirator Brian Bethel forfeited $2,422,325 of Knowles' drug proceeds to the Royal Bahamian Police Force.

R1-91 at 5 (footnotes omitted).

The government asserted that this evidence of Knowles' post-indictment drug-trafficking activities was relevant to show Knowles' knowledge and intent as to the charged offenses and to demonstrate "how Knowles' long history in the drug trafficking community shaped his participation in the charged conspiracy." Id. at 5. This evidence, the government argued, was thus admissible both under Federal

8

Rule of Evidence 404(b)[7] of the Federal Rules of Evidence and as "inextricably intertwined" evidence.  Id.

Knowles objected, arguing that the wire intercepts from July 2000 that the government sought to introduce as part of its case were inadmissible because the recorded conversations concerned conduct that occurred four years after the conspiracy charged in the indictment had ended.  He argued additionally that evidence of conduct that occurred in June 2000, August 2000, and early 2001, that the government sought to introduce was likewise "so far removed in time as to have no bearing on 404(b) criteria such as [Knowles'] state of mind, motive, plan, identity, or absence of mistake, in June 1995 – April 1996."  R1-95 at 2.  Knowles further maintained that this evidence related to the charges in the indictment in Case 1091 and thus violated the extradition treaty between the Bahamas and the United States as well as the principle of specialty.

---

[7] Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b) (2010).

The district court issued an order finding that evidence of the general relationship between Knowles and his co-conspirators that predated the conspiracy charged was admissible, but that any evidence of specific drug trafficking activities involving Knowles and his co-defendants that occurred after the conspiracy alleged in the indictment was inadmissible because it was neither inextricably intertwined with the offenses charged in the indictment nor relevant to any issue other than Knowles' character.[8]

The government filed a motion for reconsideration, arguing that evidence of Knowles' post-indictment drug trafficking activities was "inseparable from and continuous to the charged drug conspiracies." R1-112 at 1-2. The government also asserted that the wiretap evidence, including dozens of recorded telephone calls in which Knowles "g[a]ve orders to his subordinates about transporting drugs, explain[ed] how to ship drug proceeds, discusse[d] procedures for maintaining drug stash houses and avoiding police scrutiny, and . . . threaten[ed] to shoot and kill estranged Colombia drug trafficking associates," was necessary "to corroborate the testimony of cooperating witnesses, . . . whose credibility necessarily w[ould]

_____

[8] In rendering its decision, the court first noted that the doctrine of specialty, which provides that a criminal defendant who has been extradited pursuant to an extradition treaty may be tried only for those offenses for which the transferring nation granted extradition, see United States v. Puentes, 50 F.3d 1567, 1572 (11th Cir. 1995), limited only the charges that may be brought in an indictment and not the scope of evidence admissible against an extradited defendant.

10

be attacked by the defense." Id. at 3. The government further urged that evidence of Knowles' post-indictment activities was admissible under Rule 404(b) because "the continuous, uninterrupted series of drug transactions that Knowles engaged in with his co-conspirators [was] highly probative of Knowles' motive, opportunity, intent, preparation, plan, and knowledge to commit the drug trafficking crimes alleged in the instant indictment." Id. at 7.

Upon reconsideration, the district court agreed with the government that the intercepted conversations from 2000 were admissible under Rule 404(b) because they showed Knowles' intent, knowledge, plan, identity, preparation, and signature. Further, since the source of this evidence was Knowles himself, the probative value of the recorded conversations was not substantially outweighed by the danger of unfair prejudice. The court concluded that while the wiretap evidence could be presented to the jury, the other evidence remained inadmissible.

Knowles proceeded to trial in November 2007.[9] After the jury failed to reach a unanimous verdict, the district court declared a mistrial, and Knowles was tried again in 2008. At Knowles' 2008 trial, the government presented the testimony of several cooperating witnesses.

---

[9] The day before his first trial was set to begin, Knowles filed a motion to dismiss the indictment on the grounds that his Sixth Amendment right to a speedy trial had been violated, which the district court denied ore tenus.

11

A. *Newton's Testimony*

Knowles' nephew, Nehru Newton, testified that he was living in Nassau in the spring of 1995 when he starting working for Knowles running drugs from Jamaica to the Bahamas on "go-fast" boats.[10]  R12 at 250, 259-63.  In April 1995, Knowles called Newton and told Newton to go to Freeport, Bahamas, to pick up a boat from Kyle Weech ("Weech").  Newton was to navigate the boat, a white and blue 37 Midnight equipped with four engines, to Jamaica in order to transport drugs back to the Bahamas.  Biswick Musgrove ("Musgrove") and an individual named "Bart" went with Newton to help drive the boat to Jamaica, which was a twenty-four hour trip.  Marvin Weech ("Marvin"), Kyle Weech's brother, met Newton with the boat at a dock in Freeport.  Per Knowles' instructions, Newton and his crew headed for Ochos Rios, on the north side of Jamaica.   Newton drove the first twelve hours and Bart drove the remaining distance.  Once they arrived in Ochos Rios, they went to meet Knowles at the Gentle Winds Hotel in Saint Mary, Jamaica, about a mile or two outside of Ochos Rios.  Herbert Beneby ("Beneby"), a Bahamian police officer, Eric Gardiner ("Gardiner"), Weech, and Brian Bethel ("Bethel") all were with Knowles at the Gentle Winds.  A few nights after Newton

---

[10] Newton explained that "go-fast" boats are speed boats custom-fitted with multiple engines and modified fuel tanks which enable them to travel long distances at high speeds in order to evade law enforcement vessels.

12

had arrived in Jamaica, Knowles told him to take the boat back to the Bahamas. When Newton, accompanied by Weech, Bethel, Musgrove, and an individual named "Gustavo," who worked for Gardiner, were about one mile off the Jamaican coast, two small fishing boats pulled alongside the 37 Midnight. Two Jamaican fishermen began handing cocoa bags filled with a total of 600 kilograms of cocaine to Weech and Bethel, who put the bags in the hatch in the bow of the boat. After the drugs were loaded onto the boat, they tried to leave the area, but by that time the weather had turned bad, causing the boat to take on water and sinking the engines. They were able to bail out the water using buckets and a hand pump, but the engines were no longer any good. Musgrove removed the cocoa sacks from the hatch and passed them to Weech, while Bethel jumped overboard and swam to land to get help. When a fishing boat came to their aid, they transferred the drugs onto the boat and offloaded them on shore. Newton, who had stayed with the 37 Midnight, flagged down another fishing boat, which pulled him to the marina. Newton called Knowles from the marina, and Knowles instructed them to return to the hotel. Newton and the rest of his crew returned to the hotel, where they met with Gardiner. Gardiner said he would hire a mechanic to fix the 37 Midnight and a captain to run the drugs because he did not believe Newton was experienced enough to run 600 kilograms to the Bahamas.

Once Weech's boat had been repaired, Weech, Bethel, Gustavo, Musgrove, the mechanic, and the new captain set out for the Bahamas, leaving at nightfall to avoid detection by the U.S. Coast Guard. As had happened previously, two small fishing boats met the 37 Midnight offshore and loaded cocaine onto the 37 Midnight. They traveled along the northern coast of Cuba, where they remained until the following night. They then began to make their way to an agreed upon location off Andros Island in the Bahamas where they were supposed to meet Marvin to refuel. Marvin was not at the prearranged location when they arrived, so they continued on to Andros, where they offloaded the drugs on a small, uninhabited island with thick vegetation. Newton, Weech, Bethel, Musgrove, and Gustavo stayed with the drugs while the mechanic and the captain took the boat to Andros. The captain and the mechanic returned after about an hour and a half and told the rest of the crew that they "got to move fast" because people on the island knew that they had drugs. They put the drugs back on the boat and headed for Bimini, Bahamas, where they delivered the cocaine to Marvin. Newton, Musgrove, the mechanic, and the captain returned to Freeport with Weech's boat, and from Freeport, Newton took a plane back to Nassau. In total, the trip took approximately thirty-six hours. Newton testified that Knowles paid him $60,000 in U.S. currency for his role in the transaction.

14

A few months later, in October or November 1995, Knowles asked Newton to navigate Paul Beneby's ("Paul") boat, a 32 Midnight with two engines, down to Ochos Rios, Jamaica, to pick up 200 kilograms of cocaine. Newton took the same route, but this time, Musgrove, Myron Mortimer, "MI," and "Chino" were on board with him. When they arrived in Jamaica, Newton went to the Gentle Winds Hotel to meet with Knowles, Gardiner, and Beneby. After about a week's stay, Newton, MI, Chino, Musgrove and Mortimer departed Jamaica under cover of night. Once again, two fishing boats approached them offshore as they were leaving Jamaica and transferred the cocaine, along with 500 pounds of marijuana, to their boat. About four hours into their return trip, the propeller on one of the engines malfunctioned. As they were fixing the propeller the following morning, a U.S. Coast Guard helicopter spotted the boat and hovered overhead. MI hurried to finish repairing the propeller and when the helicopter flew away, they sped into Cuban waters where the Coast Guard could not follow. Newton navigated the boat past Guantanamo Bay to Ragged Island, about twenty to thirty miles off the north end of Cuba. They remained there until nightfall and then left for the Bahamas. As they were leaving Cuban waters, they observed a U.S. surveillance plane and two more helicopters. Newton sped back into Cuban waters and drove the boat inside a cove. Newton held the wheel while the others stashed the drugs in the

bush. They then washed out the inside of the boat where the drugs had been stored with water and dish soap, and returned to Ragged Island. From Ragged Island, Newton drove back to Nassau, where he met with Knowles and told Knowles what had happened. The following day, Knowles instructed them to return to the cove and look for the drugs. Paul, who was a pilot, flew the crew in his plane to the cove where they had stashed the drugs and dropped the plane down to about 600-800 feet. At that point, they saw what appeared to be soldiers putting the drugs into the back of an army truck. Back in Nassau, Newton told Knowles and Gardiner what they had seen in Cuba. To "correct" the problem of the lost 200 kilograms of cocaine and 500 pounds of marijuana, Knowles told Newton to run a 37 Midnight belonging to an individual named "Casey" from Freeport to Jamaica. Casey drove the boat halfway to Acklins Island, Bahamas, in order to show Newton how to operate it. Also on board were Mortimer, Musgrove, "Unc," and "Powers." Once they arrived in Acklins, Casey took a plane back to Freeport and the rest of the crew went on to Ochos Rios, Jamaica, where they met with Knowles, Gardiner, and Beneby at the Gentle Winds Hotel.

A week after arriving in Jamaica, Newton left for the Bahamas in the speed boat, carrying 3,000 pounds of marijuana. Newton navigated to Acklins Island, where another boat was supposed to retrieve the drugs. Per Knowles' orders,

16

Newton gave the marijuana to a man in Acklins and then headed back to Jamaica, a twelve-hour trip, to pick up another 3,000 pounds of marijuana.  After receiving the drugs in Ochos Rios, Newton navigated to Island of Key Santo Domingo, between Ragged Island and Cuba, where he ran out of fuel.  As the boat drifted in the water, Newton spotted a Cuban Coast Guard boat in the distance and dumped the 3,000 pounds of marijuana overboard.  Knowles informed Newton he was fired after Newton told Knowles that he had destroyed the load of drugs.

The following spring, in April or May 1996, Knowles contacted Newton about a new job doing "air drops."  Id. at 357.  Knowles explained that he and Gary McDonald had "a little arrangement" regarding air drops, and gave  McDonald's telephone number to Newton.  Id. at 358-59.  Newton called McDonald, who was living in Colombia, and coordinated an air drop off the northern coast of Cuba.  Pursuant to their arrangement, Newton, "Rod," and Lester Beneby each drove a boat to a predetermined location at sea where they waited for an airplane to drop forty-eight bags of cocaine.  Newton and the others retrieved the bags from the water, loaded them onto their boats, and delivered them to Bethel in Freeport.  Knowles paid Newton $70,000 for his participation in the air drop.

Newton then testified that he worked for Knowles in July and August 2000 rescuing boats that were running drugs from Jamaica to the Bahamas when they

17

broke down.[11] Newton also testified regarding various recorded conversations from July 2000, which were published to the jury, between Knowles and members of Knowles' drug organization. In one call, Knowles was overheard talking to Berkley Hepburn ("Hepburn") about the discovery of Knowles' stash house in Kingston by Jamaican police. After Hepburn informed Knowles that the narcotics squad had confiscated four bags of cocaine during a raid of the stash house, Knowles instructed Hepburn to pack the remainder of the drugs "in the big white van." Id. at 385-86. Knowles was overheard in another conversation telling Beneby, who referred to Knowles as the "General," that he, Knowles, had to pay the Jamaican police $200,000 and lost 100 kilograms of cocaine because Beneby

---

[11] Prior to Newton's testimony regarding his relationship with Knowles in 2000, the court issued the following cautionary instruction to the jury:

> [E]vidence of acts of the defendant which may be similar to those charged in the indictment but which were committed on other occasions . . . must not be considered in deciding if the defendant committed the acts charged in the indictment. However, you may consider this evidence for other very limited purposes . . . .
>
> . . . . [I]f you find beyond a reasonable doubt from other evidence in this case that the defendant did commit the acts charged in the indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine whether the defendant had the state of mind or the intent to commit the crime charged, whether he had the motive or opportunity, whether he had the plan or preparation, whether it established identity or whether it was a result of accident or mistake.

R12 at 373-75.

failed to follow his orders to blindfold a Colombian who had been sent to verify that the drugs were still at the stash house. In other conversations, Knowles was overheard advising Hepburn and an individual named Julian Russell that Frank Cartwright ("Cartwright"), who smuggled drug profits back from the United States into the Bahamas for Knowles in 2000, had been caught by U.S. federal agents with $3 million in drug proceeds. In a 30 July 2000 call with "Rafael," a Colombian national who was living in Jamaica, Knowles asked Rafael whether his "people" had been seen delivering drugs to the stash house in Kingston, and in a call with Bethel, Knowles was overheard getting telephone numbers to give to Derrick Blake ("Blake") so Blake could deliver the cocaine to Colombians in Miami.

B. *Gardiner's Testimony*

The government then called Gardiner, who testified that he and Knowles arranged to smuggle 1,000 kilograms of cocaine from Jamaica into the United States in the spring of 1995. According to Gardiner, after Colombians delivered the drugs to him and Knowles in Jamaica, Knowles was responsible for securing, storing, and transporting the drugs through the Bahamas into Miami. Once in Miami, the drugs were delivered to the Colombians to distribute and sell. Gardiner testified that the Colombians hired Knowles to secure the cocaine because

Knowles "had a lot of power and strength in Jamaica . . . everyone would like go to use him or go through him because of all the influence and strength that he had in Jamaica." R13 at 512-13. Gardiner also noted that while Knowles did not actually own the Gentle Winds Hotel, "Knowles had basically full control over [it]." Id. at 533.

C. *McDonald's Testimony*

Gary McDonald ("McDonald"), a pilot from Freeport who had moved to Bogota, Colombia in 1989, next testified that he was contacted in April or May of 1996 by an individual named Nelson Urrego about transporting 1100 kilograms of cocaine from Jamaica into the United States. When Urrego asked McDonald if McDonald knew anyone who could get the drugs from Jamaica into the United States, McDonald recommended Knowles because "at that time . . . [Knowles] was the one who was pretty much controlling Jamaica." Id. at 551-54. According to McDonald, it was "common knowledge" among drug traffickers that Knowles could smuggle the drugs into the U.S. from Jamaica. Id. at 554. McDonald called Knowles and told him that he had access to 1100 kilograms of cocaine in Jamaica. Knowles agreed to help McDonald transport the cocaine to the U.S., in exchange for which Knowles would receive thirty percent of the drugs. The remaining seventy percent of the load would be delivered to the Colombians. The cocaine

20

arrived in the United States about three weeks after McDonald talked to Knowles, and McDonald was paid $500,000 for his part in the transaction. McDonald further testified that he and Knowles smuggled 2500 kilograms of cocaine into the United States in 2000.[12]

D. *Blake's Testimony*

Derrick Blake ("Blake") next testified that he met Knowles in the Bahamas in 1994 and 1995 through his friend, Herbert Hannah ("Hannah"). Knowles asked Blake how much marijuana Blake could handle, and told Blake that he could keep Blake supplied with "whatever [he] needed." R14 at 632. Shortly after returning to Miami, Blake retrieved "a couple hundred pounds of marijuana" from an individual named "Nick," whose telephone number he had received from Knowles, in Broward County and then returned to Miami, where he distributed the marijuana. Id. at 632-35. Blake thereafter contacted Knowles about giving Knowles his portion of the proceeds from the sale of the marijuana.

In 1995 and 1996, Blake and Knowles, whom Blake referred to as "the boss," had an arrangement whereby Blake, after selling the drugs, would call Knowles, who would put Blake in touch with either Cartwright or an individual named "Vivian." Blake would then deliver the money to Cartwright or Vivian,

---

[12] The court repeated its cautionary Rule 404(b) instruction to the jury before admitting this testimony.

who were responsible for delivering the money to Knowles in the Bahamas. Blake also started handling cocaine with Knowles in the spring of 1995. Blake received kilograms of cocaine from Vivian or an individual named "Marvin" during this time period.[13] Blake sold the drugs and then gave the proceeds to Vivian or Marvin. During this time, Blake was in contact with Knowles over the telephone and saw him in person in the Bahamas.

Blake further testified that he was still working for Knowles' drug organization in 2000.[14] During this time, Knowles sent loads of up to 500 kilograms of cocaine and 800 to 1,000 pounds of marijuana from the Bahamas to Miami by boat. Pursuant to Knowles' instructions, Blake would retrieve the drugs, usually around 500 kilograms of cocaine. Blake would keep 100 kilograms on Knowles' behalf and deliver the remaining kilograms to the people who had arranged with Knowles to purchase the drugs. During this time, Blake also worked with Cartwright and an individual named Glenroy Riley ("Riley"), who was sent from the Bahamas to Miami to help secure the drugs. In addition to guarding the cocaine at the stash house, Riley was responsible for counting the money once Blake sold the cocaine and then preparing it to give to Cartwright. Knowles

---

[13] It is unclear whether this "Marvin" was Marvin Weech.

[14] Before the jury heard this testimony, the court once again reminded the jury that evidence related to Knowles' drug-trafficking activities in 2000 were not to be considered in deciding whether Knowles was guilty of committing the acts charged in the indictment.

22

specifically requested that the drug proceeds be vacuum sealed so they would not get wet when being smuggled by boat back to the Bahamas.

Blake testified that in June 2000, Hannah was arrested attempting to smuggle cocaine into the United States by boat. In a recorded call on 15 July 2000, Hannah's daugher, Khristi Yates ("Yates"), told Knowles that the authorities had pictures of Hannah and Knowles together. Yates then told Blake, who was present during this phone call, that she needed $40,000 in U.S. currency to pay her father's attorneys fees. Knowles and Blake agreed that Blake would sell some of the kilograms he had set aside for Knowles in order to give Yates the $40,000 she needed. Blake testified that he had already given Yates $100,000 out of Knowles' drug proceeds for Hannah's defense. In a 21 July 2000 phone call between Blake and Knowles, Knowles expressed concern that the authorities would start investigating the source of the money. In other recorded conversations, Blake told Knowles that, per Knowles' instructions, he had delivered a Samsonite suitcase containing $600,000 in drug proceeds to Riley and Cartwright at a hotel in Miami. In another call on 24 July 2000, Knowles told Blake, "just be cool and watch, watch around you now, stay clean," which meant that Blake was to be alert and avoid carrying any contraband. R14 at 664-65. In a 29 July 2000 call, Blake told Knowles that he was waiting at a scheduled meeting place to deliver drugs to the

23

Colombians, who were late. Knowles told Blake, "you got to handle them and they got to play," which meant that Blake was to make sure the Colombians knew that Knowles was in control of the drug transaction and that it had to be done according to Knowles' rules.[15] Later that day, Blake was overheard in a recorded telephone call telling Knowles that he had completed the drug transaction, during which he sold "[s]ome kilos of cocaine" to the Colombians, and that he would call Knowles after he dropped off another 200 kilograms of cocaine to the Colombians. Id. at 673-75.

E. *Riley's Testimony*

Riley then testified that in July and August 2000, he worked for Knowles collecting drug money from Blake and transporting it back to the Bahamas. Riley testified that he moved between $400,000 and $1 million to the Bahamas for Knowles either by private charter plane or boat. In recorded calls, Knowles instructed Riley to package a large sum of drug money in U-Haul boxes to ship by boat to the Bahamas. Knowles told Riley to wrap and seal the boxes tightly in plastic so that they would not get wet on the boat. In another call on 17 August 2000, Knowles instructed Riley to "fix up a nice box with $400." Id. at 753.

---

[15] During one conversation, Knowles referred to himself as "The General" and told Blake that "[t]he General runs everything." Id. at 669. Blake confirmed that Knowles was "the boss" and that other people also referred to Knowles as "the General." Id.

According to Riley, this meant that Riley was to prepare a box, vacuum sealed in plastic, containing $400,000 in large denominations, preferably fifty and one hundred dollar bills.

F. *Cartwright's Testimony*

Cartwright testified that on more than ten occasions from June 1995 to April 1996, he transported between $400,000 and $1 million in drug proceeds to the Bahamas for Knowles via private chartered airplane or boat.

In a recorded conversation that took place 24 July 2000, Knowles instructed Cartwright to see Riley, who gave Cartwright a black duffle bag containing money.[16]  Cartwright dropped the money off at his home and then left in his car. Drug Enforcement Administration ("DEA") agents stopped Cartwright and questioned him.  Cartwright subsequently consented to a search of his vehicle and his home, resulting in the agents' discovery of the drug money, which Cartwright had stored in boxes in his living room.  Agents also confiscated the black duffle bag, which was located on the back porch area of Cartwright's home.  In total, agents seized over $2.5 million.  In a series of recorded conversations, Knowles

---

[16] Prior to Cartwright's testimony regarding his 2000 drug-trafficking activities and publication of the recorded telephone calls from 2000 to the jury, the court stated on the record its finding that the probative value of this Rule 404(b) evidence outweighed any prejudicial effect it might have on Knowles' defense.

was overheard telling Cartwright to file a lawsuit to recover the money and to misrepresent that the sums seized were legitimate business profits.

At the conclusion of the government's case-in-chief, Knowles moved for a judgment of acquittal, which the court denied. Knowles did not present any witnesses, but merely read to the jury a stipulation that none of the government's witnesses had appeared before a grand jury in Case 425. On 5 March 2008, the jury returned guilty verdicts on both counts of the indictment. The jury also returned a special forfeiture verdict against Knowles in the amount $13.9 million.

Prior to sentencing, the probation office prepared a presentence investigation report ("PSI"), in which the probation officer assigned Knowles a base offense level of 38, pursuant to U.S.S.G. § 2D1.1(c)(1) (Nov. 1, 2007).[17] The probation officer applied a four-level increase after determining that Knowles "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). With a total offense level of 42 and a criminal history category of I, Knowles' advisory guidelines range was 360 months to life imprisonment.[18]

---

[17] The probation officer converted the amounts of cocaine and marijuana involved in the offenses into their combined marijuana equivalent, which was 709,248 kilograms of marijuana. *See* U.S.S.G. § 2D1.1(c)(1) (providing for a base offense level of 38 where defendant is convicted of an offense involving 30,000 kilograms or more of marijuana).

[18] Both counts carried with them a minimum term of ten years' imprisonment and a maximum term of life imprisonment. See 21 U.S.C. §§ 960(b)(1)(B) and 841(b)(1)(A).

The district court overruled Knowles' objection to the § 3B1.1(a) enhancement, finding that Knowles was an organizer or leader of a criminal conspiracy involving five or more participants. Knowles then requested that the court impose a 360-month sentence, arguing that a life sentence was too extreme given the lack of evidence that violence was involved in the offenses for which he was convicted. He argued additionally that his advanced age and poor health rendered a 360-month sentence, rather than life imprisonment, appropriate.

After stating that it had considered the parties' arguments, the advisory guidelines, and the 18 U.S.C. § 3553(a)(1) factors, the district court found "that a sentence at the lower end of the advisory guideline range [was] sufficient to adequately punish the defendant for his crimes and de[t]er future criminal conduct." R18 at 22-23. The court then sentenced Knowles to concurrent terms of 420 months' imprisonment for Counts One and Two, to be followed by concurrent terms of five years of supervised release. Knowles stated that he had no objections regarding the court's "finding of fact" or "the manner in which sentence was pronounced," other than those which he had already stated. This appeal followed.

## II. DISCUSSION

On appeal, Knowles argues that: (1) the district court erred in denying his motion to dismiss the indictment for lack of personal jurisdiction; (2) his Sixth

27

Amendment right to a speedy trial was violated, warranting dismissal of the indictment; (3) the district court abused its discretion in allowing the government to introduce wiretap evidence from 2000; (4) the district court clearly erred in applying a four-level enhancement based on his role in the offense; (5) the district court erred in sentencing him to 420 months' imprisonment after stating that it was going to impose a sentence at the low-end of the United States Sentencing Guidelines ("the guidelines"); and (6) the forfeiture verdict violated the doctrine of specialty. We address each argument in turn.

A. Personal Jurisdiction

A district court's denial of a motion to dismiss an indictment is generally reviewed for abuse of discretion only. United States v. Noriega, 117 F.3d 1206, 1211 (11th Cir. 1997). "To the extent [the appellant's] assignments of error . . . implicate the district court's resolution of questions of law, however, our review is de novo." Id. A district court's determinations regarding personal jurisdiction are subject to de novo review, and its findings of fact are reviewed for clear error. See Nippon Credit Bank, Ltd. v. Matthews, 291 F.3d 738, 746 (11th Cir. 2002) (per curiam), abrogated on other grounds by Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc., 593 F.3d 1249 (11th Cir. 2010). We also review

28

de novo a district court's conclusions of foreign law.  Belize Telecom, Ltd. v. Government of Belize, 528 F.3d 1298, 1303 (11th Cir. 2008).

Knowles reasserts the arguments he raised in his motion to dismiss, maintaining on appeal that the district court lacked personal jurisdiction to try him on the charges in the May 2000 indictment because his extradition during the pendency of his kingpin habeas application violated both the Extradition Act and the Bahamian Supreme Court's May 2004 Consent Order.  Insofar as his extradition was contrary to the Extradition Act and the Consent Order, the Bahamian executive authority's consent thereto was not "*in accordance with [the] laws*" of the Bahamas, and thus violated the Extradition Treaty.  Knowles' Initial Brief at 37-38.

As an initial matter, we find no error in the district court's determination in its decision denying Knowles' motion to dismiss that Knowles' kingpin habeas application was foreclosed by the Privy Council's decision in Matthew, and thus was not "pending" at the time of his extradition.  For purposes of this appeal, however, we conclude that the Ministry of Foreign Affairs' consent to Knowles' extradition in Case 425 was an "official act of a foreign sovereign," the validity of which we must abstain from questioning under the dictates of the act of state

29

doctrine. W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 405, 110 S. Ct. 701, 704 (1990).

The act of state doctrine, which "rests at last upon the highest considerations of international comity and expediency," "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 417-18, 84 S. Ct. 923, 926, 935 (1964) (quotation marks and citation omitted). Under the doctrine, an official act of a foreign sovereign performed within its own territory thus "must be accepted by our courts as a rule for their decision." Ricaud v. Amer. Metal Co., 246 U.S. 304, 309, 38 S. Ct. 312, 314 (1918). Because holding that Bahamian authorities violated Bahamian law in authorizing Knowles' extradition "would . . . require a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory," the act of state doctrine applies and prohibits us from evaluating the legitimacy of Knowles' extradition. W.S. Kirkpatrick, 493 U.S. at 405, 110 S. Ct. at 706 (declining to apply the act of state doctrine where "[n]othing in the . . . suit require[d] the Court to declare invalid, and thus ineffective as a rule of decision for the courts of this country, the official act of a foreign sovereign" (citation omitted)). Accordingly, Knowles' challenge to his extradition must fail.

30

B. Sixth Amendment Right to a Speedy Trial

Knowles argues that the government deliberately and in bad faith waited 21 months after his 2000 indictment to file an extradition request with the Bahamian government. He alleges that this nearly two year delay violated his Sixth Amendment right to a speedy trial and warranted dismissal of the indictment. We disagree.

"We review de novo the denial of a motion to dismiss for a violation of the right to a speedy trial under the Sixth Amendment." United States v. Knight, 562 F.3d 1314, 1321 (11th Cir. 2009). The Sixth Amendment guarantees individuals a speedy trial in the state and district in which the crime was committed. See United States v. Merrill, 513 F.3d 1293, 1304 (11th Cir. 2008). The right to a speedy trial under the Sixth Amendment attaches at the time of arrest or indictment, whichever comes first. Knight, 562 F.3d at 1323.

When determining whether the government has violated a defendant's speedy trial right, we consider four factors: (1) the length of the delay; (2) the reason for the delay; (3) whether and how the defendant asserted his speedy trial right; and (4) prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972). No factor, standing alone, is sufficient to establish that the defendant's Sixth Amendment right has been violated. United States v. Schlei,

122 F.3d 944, 987 (11th Cir. 1997). "[U]nless the first three Barker factors all weigh heavily against the government, the defendants must demonstrate actual prejudice." United States v. Mitchell, 769 F.2d 1544, 1547 (11th Cir. 1985).

"The first factor serves a triggering function; unless some 'presumptively prejudicial' period of delay occurred, we need not conduct the remainder of the analysis." United States v. Register, 182 F.3d 820, 827 (11th Cir. 1999). "A delay becomes 'presumptively prejudicial' as it approaches one year." Knight, 562 F.3d at 1323. We will assume without deciding that the 21-month delay between Knowles' indictment and the government's extradition request was presumptively prejudicial, warranting inquiry into the remaining three factors. See Schlei, 122 F.3d at 987.

With respect to the second factor, we find that although the post-indictment delay in Case 425 was arguably attributable to the government, Knowles has presented no compelling evidence of bad faith on the part of the government. This factor therefore does not weigh heavily against the government. See United States v. Davenport, 935 F.2d 1223, 1239-40 (11th Cir. 1991).[19] The third factor –

_____

[19] In Davenport, we addressed whether the appellant's twenty-one month pretrial detention violated his right to a speedy trial. In analyzing the second Barker factor, we found that "[w]hile the government arguably [was] responsible under Barker for the delay in this case, . . . [t]here [wa]s absolutely no evidence of bad faith by the government." 935 F.2d at 1240. We noted that "[t]he reasons for delay . . . were, at worst, neutral reasons," and, moreover, that "the government's actions were taken in pursuit of a valid and important judicial policy favoring joint trials." Id. In light of these findings, we held that, notwithstanding the

32

whether and how the defendant asserted his speedy trial right – clearly cuts against Knowles. The record reflects that, following his indictment in Case 425, Knowles "made no attempt to demand a trial, to waive extradition, or to otherwise seek to return to the United States for trial." United States v. Mitchell, 957 F.2d 465, 469 (7th Cir. 1992); see also United States v. Manning, 56 F.3d 1188, 1195 (9th Cir. 1995) (stating that defendant "cannot avoid a speedy trial by forcing the government to run the gauntlet of obtaining formal extradition and then complain about the delay that he has caused by refusing to return voluntarily to the United States," and holding that defendant's "affirmative resistance of the government's efforts to secure his presence in the United States constitute[d] an intentional relinquishment of his right to a constitutional speedy trial," precluding him from "now complain[ing] of the delay that he himself caused"). In fact, Knowles did not assert his right to a speedy trial until 12 November 2007, the day before his trial was to begin. Schlei, 122 F.3d at 988 ("A defendant's failure to assert his Sixth Amendment right to a speedy trial before the day of trial weighs heavily against the defendant.").

Because the third factor weighs heavily in favor of the government, Knowles must establish actual prejudice. See id.; Mitchell, 769 F.2d at 1547 (defendants

government's ultimate responsibility for the delay, "the reasons for delay d[id] not weigh heavily against the government and d[id] not excuse a showing of actual prejudice." Id.

were required to show actual prejudice where only two of the first three <u>Barker</u> factors weighed heavily against the government).  We assess prejudice to the defendant in light of the interests the right to a speedy trial was designed to protect, which are: (1) "prevent[ing] oppressive pretrial incarceration"; (2) "minimiz[ing] anxiety and concern of the accused"; and (3) "limit[ing] the possibility that the defense will be impaired."  <u>Barker</u>, 407 U.S. at 532, 92 S. Ct. at 2193.  "[B]ecause the inability of a defendant adequately to prepare his case skews the fairness of the entire system," protection of the third interest is paramount.  <u>Id.</u>

Knowles does not claim that he suffered oppressive pretrial incarceration or experienced undue anxiety or concern, but argues that he was prejudiced because the government's extradition request would have been denied had the government requested extradition in Case 425 at the same time it requested extradition in Case 1091.  The test for prejudice, however, is not whether the defendant's ability to defend himself during the *extradition proceedings* was impaired, but whether the defendant was impaired in his ability to defend himself at *trial* against the charges in the indictment.  <u>See</u>, <u>e.g.</u>, <u>Doggett v. United States</u>, 505 U.S. 647, 655, 112 S. Ct. 2686, 2693 (1992) (noting that, in addressing the fourth <u>Barker</u> criterion, courts must "recognize that excessive delay presumptively compromises the reliability of a *trial* in ways that neither party can prove or, for that matter, identify") (emphasis

34

added); Barker, 407 U.S. at 534, 92 S. Ct. at 2194 (holding that prejudice was minimal because "there [wa]s no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay. The trial transcript indicate[d] only two very minor lapses of memory – one on the part of a prosecution witness – which were in no way significant to the outcome"); United States v. Dunn, 345 F.3d 1285, 1297 (11th Cir. 2003) (finding that appellant "ha[d] not shown – and could not show – that the delay prejudiced his defense at all because he had no defense, as he had stipulated to each element of the § 922(g) offense"); see also Martin v. Warden, Atlanta Pen, 993 F.2d 824, 829 (11th Cir. 1993) (stating that because "Constitutional procedural protections which by their terms are applicable only in criminal cases . . . are unavailable in extradition proceedings, . . . . there is no Sixth Amendment right to a speedy trial in extradition cases").[20]

---

[20] We point out that, to the extent Knowles is attempting to assert a right to a "speedy extradition," that argument must fail, as no such right exists. See Martin, 993 F.2d at 829. Martin involved an American citizen who had been charged by Canadian authorities in December 1974 with criminally negligent homicide arising out of a car accident wherein he struck and killed a young boy. Id. at 826-27. Although Martin fled to the United States in January 1975, Canadian authorities did not request his extradition to answer the charges until 1992. Id. at 827. After a magistrate judge found that Martin was extraditable, Martin filed a petition for habeas corpus, which the district court denied. On appeal, Martin argued that Canada's seventeen year delay in seeking his extradition violated his due process right to a "speedy extradition." Id. In order to resolve the issue of whether Martin had a constitutional right under the Due Process Clause of the Fifth Amendment to a "speedy extradition," we first analyzed whether he would have a right to a speedy trial under the Sixth Amendment in his extradition proceedings. See id. at 829. We concluded that he would not, because "[c]onstitutional procedural protections which by their terms are applicable only in criminal cases . . . are unavailable in extradition proceedings." Id. For purposes of resolving this appeal, however, we assume that Knowles has properly alleged a violation of his Sixth Amendment

35

Knowles does not argue, and there is no evidence to suggest, that his ability to prepare his case and defend himself at trial against the conspiracy charges in the indictment was impaired by the 21-month delay between his indictment and the government's formal extradition request. Inasmuch as Knowles has not demonstrated actual prejudice under Barker, his constitutional speedy trial claim must fail.

## C. Evidentiary Issues

Knowles argues that the district court erred in allowing the government to introduce evidence of acts that were committed in 2000 because the admission of such evidence, which he asserts related exclusively to the charges in Case 1091, violated the doctrine of specialty. He argues additionally that the court abused its discretion in admitting this evidence under Federal Rule of Evidence 404(b) because it was not relevant to prove either intent or *modus operandi*, and its probative value was substantially outweighed by the danger of undue prejudice.

### 1. *Doctrine of Specialty*

_____

speedy trial right based on the delay between his indictment and the extradition request. See, e.g., Manning, 56 F.3d at 1194 (stating that, for purposes of appellant's Sixth Amendment speedy trial claim, "[t]he only delay relevant to the question of whether [appellant] was deprived of his Sixth Amendment right to a speedy trial [wa]s the 30 month delay between [hi]s indictment and the government's formal extradition request").

The doctrine of specialty prohibits a nation that receives a criminal defendant pursuant to an extradition treaty from trying the defendant for any offenses other than those for which the surrendering nation granted extradition. United States v. Bowe, 221 F.3d 1183, 1191 (11th Cir. 2000). "It is well settled in this circuit that the doctrine of specialty limits only the charges on which an extradited defendant can be tried; it does not affect the scope of proof admissible at trial for the charges for which extradition was granted, and it does not alter the forum country's evidentiary rules." Id. (quotation marks and citations omitted).

Knowles was tried for and convicted of conspiracy to possess with intent to supply cocaine and conspiracy to import cocaine, both charges for which the Bahamian government expressly authorized extradition. See id. ("Because Bowe was charged with and convicted of only the conspiracy to import cocaine, for which the Bahamian government approved his extradition, the prosecution's sweeping evidentiary case did not violate the doctrine of specialty."); United States v. Lehder-Rivas, 955 F.2d 1510, 1520 (11th Cir. 1992) ("We also find meritless Lehder's assertion that the admission of 'extrinsic' evidence at trial permitted his prosecution on charges unauthorized by the extradition treaty. The rule of specialty is not violated when evidence is properly admitted under the inextricably intertwined doctrine to reflect the scope of the conspiracies, to prove intent, and to

37

aid the jury in determining the nature of the offenses charged." (quotation marks and citation omitted)). In light of the foregoing, Knowles' assertion that the admission of evidence related to his 2000 drug-trafficking activities resulted in his prosecution for crimes for which he was not extradited pursuant to the extradition treaty is without merit.

2. *Rule 404(b) Evidence*

"We review the court's resolution of . . . evidentiary issues for abuse of discretion, and if such an abuse occurred, we ask whether the error was harmless." Bowe, 221 F.3d at 1192. "When the record contains sufficient independent evidence of guilt, any error is harmless." United States v. Duran, 596 F.3d 1283, 1299 (11th Cir. 2010) (quotation marks and citations omitted); United States v. Jones, 28 F.3d 1574, 1582 (11th Cir. 1984), modified on other grounds by United States v. Jones, 74 F.3d 275 (11th Cir. 1996) ("[A]n error in the application of Rule 404(b) is harmless when there is overwhelming evidence of the defendant's guilt.").

At trial, the government presented substantial evidence, to wit, the testimony of Newton, Gardiner, McDonald, Blake, and Cartwright, that Knowles conspired with them, beginning in the spring of 1995 and continuing through 1996, to transport large quantities of marijuana and cocaine from Jamaica to the Bahamas

and then into the United States; to distribute and sell those drugs in Miami; and to transport the proceeds from the sale of those drugs back to the Bahamas. This evidence was alone sufficient to find Knowles guilty on both counts of the indictment. In sum, we need not determine whether the wiretap evidence from 2000 was properly admitted under Rule 404(b) because we find that, even if admission of that evidence was error, it was harmless given the overwhelming evidence of Knowles' guilt presented at trial. See United States v. Hersh, 297 F.3d 1233, 1254 n.31 (11th Cir. 2002) (any error in admitting Rule 404(b) was "harmless in light of the overwhelming evidence establishing Hersh's guilt"); Puentes, 50 F.3d at 1578 (finding that while district court abused its discretion in admitting evidence of Puentes' participation in a prior drug smuggling conspiracy, the district court's error was harmless in light of the overwhelming evidence of Puentes' participation in the charged conspiracy); United States v. Hosford, 782 F.2d 936, 939-40 (11th Cir. 1986) (per curiam) (declining to address merits of appellant's claim that district court erred in admitting prior bad acts evidence under Rule 404(b) "because even assuming that the district court abused its discretion in admitting this evidence, it was at most harmless error" in light of overwhelming evidence of guilt (quotation marks and citation omitted)); cf. United States v. Carrasco, 381 F.3d 1237, 1241 (11th Cir. 2004) (per curiam) (admission of Rule

404(b) evidence was not harmless error where "the [g]overnment did not have overwhelming evidence of Carrasco's intent to commit his charged offense" (quotation marks omitted)).

D. Knowles' Sentence

1. *U.S.S.G. § 3B1.1(a) Enhancement*

A district court's determination of a defendant's role in the offense is a finding of fact subject to review for clear error only. United States v. De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). So long as the district court's decision is supported by the record and applies the law correctly, it will not be clearly erroneous. Id. at 945.

Section 3B1.1(a) of the Sentencing Guidelines provides for a four-level increase in a defendant's base offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (Nov. 1, 2007). A two-level increase is applied if the defendant "was an organizer, leader, manager, or supervisor in any criminal activity other than described in [U.S.S.G. § 3B1.1](a) or (b)." U.S.S.G. § 3B1.1(c). "In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling." U.S.S.G. § 3B1.1, comment. (n.4). Instead, the district court should

40

consider factors such as: (1) the defendant's exercise of decision making authority; (2) the nature of the defendant's participation in the commission of the offense; (3) whether the defendant recruited accomplices; (4) the defendant's claimed right to a larger share of the fruits of the crime; (5) the extent to which the defendant participated in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority the defendant exercised over others. Id.

The testimony at trial established, inter alia, that: (1) Newton worked for Knowles transporting cocaine and marijuana from Jamaica to the Bahamas in 1995 and 1996; (2) Blake received marijuana and cocaine in Miami per Knowles' instructions and then sold the drugs on Knowles' behalf in 1995 and 1996; (3) both Cartwright and Blake shipped drug proceeds ranging from $400,000 to $1,000,000, from the United States to Knowles in the Bahamas in 1995 and 1996; and (4) Gardiner and McDonald both planned drug deals with Knowles during the relevant time period. This testimony establishes that Knowles' drug conspiracy involved at least five people.

The evidence also demonstrates that Knowles was a leader and not a mere manager or supervisor. The testimony at trial reflected that Knowles had decision making authority and a high "degree of participation in planning or organizing the

41

offense," U.S.S.G. § 3B1.1, comment. (n.4), that Knowles arranged drug deals

involving multiple-ton quantities of cocaine and marijuana, and that Knowles was

responsible for securing the drugs and transporting them to the United States for

distribution and sale.  Given this evidence, the district court did not clearly err in

finding that Knowles was a leader or organizer of the conspiracy for purposes of

applying a four-level enhancement under § 3B1.1(a)

2. *Reasonableness*

Knowles further challenges his sentence on the grounds that it is

procedurally and substantively unreasonable because the district court, after stating

that it would impose a sentence at the low end of his guideline range, sentenced

him to 420, rather than 360, months of imprisonment.

We review a sentence, whether inside or outside the guidelines range, for

reasonableness, using an abuse-of-discretion standard.[21]  Gall v. United States, 552

U.S. 38, 51, 128 S. Ct. 586, 597 (2007).  We first look to see whether the district

court committed a "significant procedural error, such as failing to calculate (or

improperly calculating) the Guidelines range, treating the Guidelines as mandatory,

---

[21] Knowles failed to object to the reasonableness of his sentence during the sentencing
hearing.  Although issues raised for the first time on appeal are generally subject to plain error
review, see United States v. Jones, 289 F.3d 1260, 1265 (11th Cir. 2002) (per curiam), we have
not squarely decided in a published opinion whether plain error is the appropriate standard of
review where, as here, a defendant challenges the reasonableness of his sentence for the first
time on appeal.  Nevertheless, we need not resolve this issue in the present case, because
Knowles' sentence is due to be affirmed under either standard.

42

failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range." Id.

If we are satisfied that there has been no procedural error, we then consider whether the sentence imposed is substantively reasonable. Id. When making this determination, we must consider the factors outlined in § 3553(a) and the district court's reasons for imposing the particular sentence. United States v. Williams, 435 F.3d 1350, 1355 (11th Cir. 2006) (per curiam). Those factors include, inter alia: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (b) afford adequate deterrence to criminal conduct; and (c) protect the public from further crimes of the defendant; (3) the kinds of sentences available; and (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. See 18 U.S.C. § 3553(a). When applying these factors to a particular sentence, "[t]he weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court, and we will not substitute

our judgment in weighing the relevant factors." United States v. Amedeo, 487 F.3d 823, 832 (11th Cir. 2007) (quotation marks, alterations, and citation omitted).

While the district court must consider the § 3553(a) factors, it is not required to discuss each factor. United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005) (per curiam). Rather, "an acknowledgment by the district court that it has considered the defendant's arguments and the factors in section 3553(a) is sufficient." Id. Where the court imposes a within-guidelines sentence, the district court need only "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Rita v. United States, 551 U.S. 338, 356, 127 S. Ct. 2456, 2468 (2007). In determining if the district court has adequately considered the defendant's arguments and the § 3553(a) factors, we may look to the district court's statements over the course of the sentencing hearing. See Williams, 435 F.3d at 1355; see also Rita, 551 U.S. at 358-59, 127 S. Ct. at 2469 (holding that while the district court did not explicitly state that it had considered each argument and the supporting evidence, the context and the record made clear the reasoning underlying the court's conclusion). We have also compared the sentence actually imposed to the statutory maximum when conducting a

44

reasonableness review.  See United States v. Dorman, 488 F.3d 936, 945 (11th Cir.

2007).

Although we do not presume reasonable a sentence that is within the

guidelines range, United States v. Campbell, 491 F.3d 1306, 1313 (11th Cir. 2007),

we have held that the use of the guidelines remains central to the sentencing

process, Talley, 431 F.3d at 787.  Accordingly, "when the district court imposes a

sentence within the advisory Guidelines range, we ordinarily will expect that

choice to be a reasonable one."  Id. at 788.

Knowles has not carried his burden of establishing that the sentence imposed

was unreasonable.  In fashioning Knowles' sentence, the district court explicitly

stated that it had "considered the statements of all parties, the presentence report

which contains the advisory guidelines as well as those statutory factors set forth in

[18 U.S.C. § 3553(a)]," and then found that a 420-month sentence, at the low-end

of the guidelines range, was "sufficient to adequately punish the defendant for his

crimes and de[t]er future criminal conduct."  R18 at 22-23.  Although Knowles

contends that his 420-month total sentence is tantamount to a life sentence because

of his age, he has not provided any compelling argument that the court abused its

discretion when weighing the sentencing factors in his case.  Moreover,  Knowles'

420-month total sentence, which is only 60 months greater than the low end of his

guideline range, is significantly less than the statutory maximum of life imprisonment. See, e.g., United States v. Valnor, 451 F.3d 744, 751-52 (11th Cir. 2007) (affirming as reasonable a 28-month sentence, which was "appreciably below the length of the [180-month] statutory maximum.").

F. Forfeiture Verdict

In his final allegation of error, Knowles argues that the forfeiture verdict violated the doctrine of specialty because the Warrant of Surrender, which was issued only for the first two counts of the indictment, did not contain the forfeiture count. He further argues that the Ministry of Foreign Affairs' 4 September 2006 Diplomatic Note provided that the U.S. government was required to submit a formal application if it wished to waive the specialty rule but failed to do so. Knowles' argument is without merit.

It is well-settled that "criminal forfeiture [i]s an aspect of *punishment* imposed following conviction of a substantive criminal offense." Libretti v. United States, 516 U.S. 29, 39, 116 S. Ct. 356, 363 (1995) (emphasis added).[22] See

_____

[22] In Libretti, the Court acknowledged its prior statement in Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 628 n.5, 109 S. Ct. 2646, 2654 n.5 (1989), cited by Knowles in his brief, that "forfeiture is a substantive charge in the indictment against a defendant," but explained that Caplin was not controlling because

> [t]hat statement responded to the defendant's claim that his Sixth
> Amendment right to counsel 'for his defense' could be
> transformed into a defense to a forfeiture count in the indictment.
> We intended only to suggest that a defendant cannot escape an

46

also United States v. Saccoccia, 58 F.3d 754 (1st Cir. 1995) ("[C]riminal forfeiture

is a punishment, not a separate criminal offense."); United States v. Elgersma, 971

F.2d 690, 694 (11th Cir. 1992) ("[C]riminal forfeiture is part of the sentencing

process and not an element of the crime itself."); United States v.

Hernandez-Escarsega, 886 F.2d 1560, 1576-77 (9th Cir.1989) ("[F]orfeiture of

property is not an element of the continuing criminal enterprise offense; it is an

additional penalty prescribed for that offense."); United States v. Sandini, 816 F.2d

869, 875 (3d Cir. 1987) (same). Because criminal forfeiture is not a substantive

charge against the defendant, the doctrine of specialty is not violated where, as

here, a defendant is subjected to criminal forfeiture charges with respect to which

he was not formally extradited. See Saccoccia, 58 F.3d at 784 (holding that

appellant was properly subjected to a forfeiture order, even though extradition was

---

otherwise appropriate forfeiture sanction by pointing to his need
for counsel to represent him on the underlying charges. Elsewhere
in [*Caplin*] we recognized that forfeiture is a 'criminal sanction,'
and is imposed as a sentence under [21 U.S.C.] § 853.

Libretti, 516 U.S. at 40, 116 S. Ct. at 363 (citations omitted). The Libretti court also expressed
its disapproval of "[t]he Advisory Committee's 'assumption' that 'the amount of the interest or
property subject to criminal forfeiture is an element of the offense to be alleged and proved.'"
Id. at 41, 116 S. Ct. at 364 (citing Advisory Committee's Notes on Fed. R. Crim. P. 31).
According to the Court, "[t]he fact that the Rules attach heightened procedural protections to
imposition of criminal forfeiture as punishment for certain types of criminal conduct cannot alter
the simple fact that forfeiture is precisely that: punishment." Id. The Court further noted that
"[t]he Committee's assumption runs counter to the weighty authority discussed above, all of
which indicates that criminal forfeiture is an element of the sentence imposed for a violation of
certain drug and racketeering laws." Id.

not specifically granted with respect to the forfeiture charges, because "forfeiture is neither a free-standing criminal offense nor an element of a racketeering offense under RICO, but is simply an incremental punishment for that proscribed conduct").

## III. CONCLUSION

For the foregoing reasons, Knowles' convictions and sentences are

**AFFIRMED.**